In the Matter of the Application of THE NIAGARA FALLS POWER COMPANY, Petitioner, for a Certiorari Order against THE WATER POWER AND CONTROL COMMISSION, Respondent.

In the Matter of the Application of THE CITY OF NIAGARA FALLS, Petitioner, for a Certiorari Order against THE WATER POWER AND CONTROL COMMISSION, Respondent.

Third Department, December 30, 1932.

*LeBoeuf & Winston* [*Randall J. LeBoeuf, Jr.*, and *Chauncey P. Williams, Jr.*, of counsel], for the petitioner The Niagara Falls Power Company.

*George E. Carrie, Corporation Counsel*, for the petitioner The City of Niagara Falls.

*John J. Bennett, Jr., Attorney-General* [*Paul Shipman Andrews, Special Assistant Attorney-General*, of counsel], for the respondent.

HILL, J. We are reviewing, under an order of certiorari, a resolution of the Water Power and Control Commission, adopted October 9, 1930, fixing an annual rental to be paid by the petitioner of five dollars per horse power on 500 cubic feet per second of water diverted from the Niagara river for power purposes. It is undisputed that the flowage of one cubic foot of water per second produces twenty-one horse power annually. Chapter 596 of the Laws of 1918 permitted the organization of petitioner by the merger of three then existing corporations, Cliff Electrical Distributing Company, The Niagara Falls Power Company and the Hydraulic Power Company of Niagara Falls. The State, by letters patent and acts of the Legislature, had granted lands in the bed of the Niagara river and the right to divert certain of its waters to two of the constituent companies. Chapter 597 of the Laws of 1918 provided, " that if the corporation constituted by such consolidation shall divert from the Niagara river for power purposes more than fifteen thousand one hundred cubic feet per second, there shall

be reserved to the State the right to charge an equitable rental therefor." From and after March 25, 1922, petitioner diverted more than the specified amount, and on January 1, 1925, the Water Power Commission (by later statute designated as the Water Power and Control Commission) by resolution determined the amount of additional diversion to be 4,400 cubic feet per second, and fixed a rental therefor of $60,000 per year for the ten years following the date of the resolution. This amounted to about sixty-five cents per horse power. The total amount of diversion as of the last-mentioned date was 19,500 cubic feet per second. The diversion of waters from the Niagara river above the falls by the United States and the Dominion of Canada, respectively, has been the subject of a treaty with Great Britain, under which the total diversion permitted on the American side is 20,000 cubic feet per second. The Federal government has given its permit to petitioner for the withdrawal of the entire 20,000 cubic feet per second. The 500 cubic feet per second which is the subject of the resolution under review completes the diversion permitted under the treaty. The diversion by the petitioner exceeded 19,500 cubic feet per second on October 26, 1925, and from and after October 1, 1928, the entire 20,000 cubic feet per second was diverted. The resolution fixes the back rental for the 500 cubic feet per second at five dollars per horse power and establishes the same rate from the date of the resolution to January 1, 1935, thus making both the sixty-five-cent and the five-dollar rates expire on the same date.

Petitioner, by availing itself of the privileges granted in chapters 596 and 597 of the Laws of 1918, assumed the reciprocal burdens, among them being that of paying an equitable rental for the water diverted in excess of 15,100 cubic feet per second. The provision is, " That if the corporation constituted by such consolidation shall divert from the Niagara river for power purposes more than fifteen thousand one hundred cubic feet per second, there shall be reserved to the State the right to charge an equitable rental therefor in such amount and in such manner as shall *hereafter be provided by law.*" The amount of the rental and the manner of payment was thereafter " provided by law " by chapter 242 of the Laws of 1922, which became subdivision 13 of section 614 of the Conservation Law. " The commission:   *   *   *   13. Shall have the power to fix and determine, after a hearing held upon notice to the parties interested, the amount of an equitable rental, which is hereby charged pursuant to the reservation made by chapter five hundred and ninety-seven of the laws of nineteen hundred and eighteen, for the diversion, as specified in such chapter, of water from the Niagara river in excess of a daily diversion at the rate of fifteen thousand one hundred

cubic feet per second, and which shall be fixed in like manner as if the application was made for a license under the provisions of this article before the water was used, and the people of the state may sue for and collect in behalf of the State such rental as so fixed and determined." The manner of fixing the amount to be paid when an application has been made for a license as above mentioned is provided by subdivision 2 of section 616 of the Conservation Law: " 2. Each license covering water power sites or lands, the title to which is vested in the State, shall require the payment by the licensee of an annual charge measured by a fair rental value thereof; in other cases, except where the State has no proprietary interest, an equitable annual charge may be made, in determining which the Commission shall give consideration to the cost of producing power by others in competition with the licensee; and every license shall require the payment by the licensee of an annual charge for the purpose of reimbursing the State for the cost of administration of the provisions of this article." In applying the rules so laid down, it is necessary for the Commission to determine whether the title to water power sites or lands used by the petitioner is vested in the State; if so, " a fair rental value " of those water power sites or lands is to be fixed. If the title to the water power sites or lands is not vested in the State, but the State has a proprietary interest therein, " an equitable annual charge " is to be made. The Commission, in determining the amount in the latter event, is to consider among other things " the cost of producing power by others in competition with " the petitioner. And irrespective of title, or proprietary interest, the " equitable rental " of chapter 597 is to include a proportionate charge " for the purpose of reimbursing the State for the cost of administration " of article 14 of the Conservation Law. Petitioner contends that the above statutory rules have been violated by the Commission. The determination of the amount of rental is a legislative function, which has been delegated by the Legislature to the Water Power and Control Commission. Whether the State has title to lands or sites or a proprietary interest therein is a mixed question of law and fact. Our review is limited to errors of law, unless the decision of a question of fact is arbitrary and capricious, and we may not substitute our judgment on a question of fact for that of the Commission. (*People ex rel. N. Y. & Queens Gas Co.* v. *McCall*, 219 N. Y. 84; affd., 245 U. S. 345; *Matter of Grade Crossings* [*N. Y. C. R. R. Co.*], 255 N. Y. 320.)

The State rests its claim to title and proprietary interest upon (1) its sovereignty and the incidental control of navigable waters, and the right to retake corporeal hereditaments earlier granted if

required for the public welfare, and (2) the interference with the riparian rights appurtenant to the Niagara Reservation Park, fronting upon the river between petitioner's intake and discharge, caused by the diversion of water through petitioner's canals and the resultant diminution in the amount of water passing the park lands.

As to the claim of sovereign control; prior to the numerous letters patent and legislative grants to petitioner and its predecessors, the State owned the bed of the Niagara river to the international boundary line. By letters patent it has conveyed, so far as it may, all filled lands now occupied by petitioner and all lands under water on which its intake structures are located in the bed of the river above the falls, with the exception of the location of certain ice booms and cribs. The right to divert the water of the river for power purposes has been the subject of several legislative grants, now inuring to the benefit of the petitioner. Two of these grants require consideration. Chapter 968 of the Laws of 1896 established a measure to be used to determine the amount of water which the Niagara Falls Hydraulic Power and Manufacturing Company, one of the constituents of petitioner, was permitted to divert as being such " quantity of water as may be drawn by means of the hydraulic canal of said company when enlarged throughout its entire length to a width of one hundred feet and to a depth and slope sufficient to carry at all times a maximum uniform depth of fourteen feet of water." (This act required that the exercise by the company " of the rights hereby declared and confirmed shall not impair the practical navigation of Niagara river.") The experts vary widely as to the amount of water which may be drawn through such a canal, the lowest estimate being about 6,000 cubic feet per second and the highest about 25,000 cubic feet per second. The statute which provides the means of measuring the water permitted to be taken by the Niagara Falls Power Company, also merged in the petitioner, is chapter 513 of the Laws of 1892. Therein the company was forbidden to take " more water than shall be sufficient to produce two hundred thousand effective horse power." (This statute likewise required that the company should not " infringe upon the State reservation or * * * obstruct the navigation of the Niagara river.") It is unquestioned that as of the date of this act more water was required to produce 200,000 horse power than at present because of greater efficiency of modern machinery. The State contends that the measure to be applied is the power produced; the petitioner asserts its continuing right to the amount of water which was necessary to develop the named horse power at the date of the enactment. The variance is from about 10,000 cubic feet per second to about 15,000 cubic feet per second. Such

authority as exists in this State favors the contention of petitioner. (*Carthage T. P. Mills* v. *Village of Carthage*, 200 N. Y. 1, 11, 12, 13; *Hall* v. *Sterling Iron & Railway Co.*, 148 id. 432; *Cromwell* v. *Selden*, 3 id. 253). The Commission as a fact-finding body did not determine whether the aggregate of these grants amounted to or exceeded 20,000 cubic feet per second. The necessity for such a determination is not clear. Chapter 597 of the Laws of 1918 confirmed the exercise by petitioner of all powers earlier granted to the constituent companies but neither permitted additional diversion nor waived existing rights to compensation. The Commission by fixing a rental under the provisions of that chapter and the supplemental acts mentioned, has assumed that petitioner was within its rights as to this last part of the 20,000 cubic feet per second. Should the petitioner divert water in excess of the amount granted, these statutes do not apply. The remedy and duty of the State then would be to restrain.

The nature of petitioner's title and the subject-matter of the several letters patent and legislative grants have been discussed judicially. In a tax case one of the constituent companies contended that the grants from the State amounted only to a franchise (*People ex rel. Niagara Falls P. Co.* v. *Smith*, 70 App. Div. 543; affd., 175 N. Y. 469). It was determined that the company was seized of a corporeal hereditament. The opinion, adopted by the Appellate Division, states: "The fact that the State might destroy relator's riparian rights does not convert such right into a mere franchise. Interference with the relator's rights by the State is a contingency too remote to require serious consideration." Justice HOLMES, writing upon the same subject in *International Paper Co.* v. *U. S.* (282 U. S. 399), said: "The Niagara Falls Power Company by private grant to it, Letters Patent from the State of New York and acts of the Legislature of that State, was the owner, so far as the law of New York could make it owner, of land and water rights on the American side of the river above the Falls. Included in them was a power canal through which the Power Company was authorized to divert ten thousand cubic feet per second, at the time of the alleged taking. From this canal the petitioner, the International Paper Company, was entitled, by conveyance and lease, to draw and was drawing 730 cubic feet per second — a right that by the law of New York was a corporeal hereditament and real estate." The State could not make petitioner the owner of the rights and property granted to the extent of abdicating its trust in respect of navigation (*Matter of Long Sault Development Co.*, 212 N. Y. 1), nor of its right to retake that which it had granted if required for the public welfare. (*Matter of City of Rochester* v. *Holden*, 224 N. Y. 386.) It has been said (*People ex rel. Niagara Falls P. Co.* v.

*Smith, supra*) and by me earlier quoted, "Interference with the relator's rights by the State is a contingency too remote to require serious consideration." If this be true, then the inchoate and unexercised right of the State as a sovereign to retake for either of the purposes mentioned is neither a title to "water power sites or lands" which would justify the fixing of a "fair rental value thereof" nor a proprietary interest for which "an equitable annual charge may be made" (Conservation Law, § 616, subd. 2). In so far as petitioner uses the bed of the Niagara river for its ice cribs and booms, there is a user of State lands.

The claim of the State for the loss of riparian rights is in connection with the property acquired by it for the Niagara Reservation. Its title to these lands was obtained through condemnation in 1888. At an earlier date the riparian rights appurtenant to the lands had been granted to predecessors of petitioner, at least in so far as the then existing canals diverted the water. The riparian rights could be severed from the land to which they were appurtenant. (*United P. B. Co.* v. *Iroquois P. & P. Co.*, 226 N. Y. 38.) It is not clear that there is loss of riparian rights. If so, it arises through the reduction of the volume of the river incident to a greater diversion than that contemplated in the deeds to petitioner's predecessors from the former owners. Chapter 597 of the Laws of 1918 reserves "an equitable rental therefor [the water in excess of 15,100 cubic feet per second] in such amount and in such manner as shall hereafter be provided by law." The "amount" and "manner" is made dependent upon the use of property to which the State has title or in which it has a proprietary interest. This is limited under the record to the land used for ice cribs and booms, and the loss of riparian rights, if any, appurtenant to the reservation land. Rent is dependent upon ownership, not only under this statute but by common law. "Rent is the periodic return for the privilege of use. * * * 'The usual rule is that the rent of anything shall be somewhat in proportion to its cost or value' * * *. This thought is reflected in the ancient definitions. Rent 'is a certain profit issuing yearly out of lands and tenements corporeal.'" (*City of Rochester* v. *Rochester Gas & Electric Corp.*, 233 N. Y. 39, 51.) A charge to reimburse the State for the cost of administering article 14 of the Conservation Law is proper. If this charge may not be properly defined as an item of equitable rental, it is certainly within the police power.

Chapter 597 of the Laws of 1918 does not *ipso facto* purport to give the State proprietorship in or concerning the amount of water diverted under earlier grants, for it is stated: "To such ends such

new corporation may exercise all the powers heretofore or hereafter conferred upon either or all said corporations so consolidated, provided, however, that nothing herein contained shall authorize such new corporation to divert from the Niagara river any water in excess of the amount heretofore authorized by the State of New York in respect of the corporations so consolidated." The Legislature had the power to grant the land under the Niagara river. (*Matter of Long Sault Development Co., supra,* 8.) The grant in that case was held to be " objectionable on account of the abdication of the State's control over waters which are still to be preserved as navigable, but which are to be turned over wholly to the dominion of a private corporation " (p. 10). The Niagara river, at the point where the water is diverted, is not navigable by any craft yet developed. Should the diversion affect the navigability of the river in its upper reaches, the State as sovereign could retake that already granted, but under the *Smith Case (supra)* this is " a contingency too remote to require serious consideration." The right is inchoate and incorporeal. If chapter 597 reserved to the State the right to levy a rental for property belonging to private interests, it would be confiscatory.

The resolution of 1925 determined the equitable rental to be sixty-five cents per horse power. The resolution of 1930, under review, determined the equitable rental to be five dollars per horse power. This wide variance invites, if it does not compel, the inference that widely varying elements and measures of damage were considered. This is borne out by the questions of one of the Commissioners, and the dissenting memorandum of the then Attorney-General, a member of the Commission. These indicate that the five-dollar rate, fixed by the majority of the Commission, was intended " to equalize the cost of power production throughout the State, thus giving all of the State an equal advantage in Niagara Falls." Eutopian as that concept might be if we were standing at the beginning, it seems an improper rule at the present time in view of the grants made by the State, and the expenditures of private capital made in reliance, not only for development of power, but for property generally in that area, because of the natural advantages. Neither does the statute defining the amount and manner of fixing the equitable rental permit such distribution of benefits.

The Commission, in determining the amount of rent which would be equitable between the power company and the State, should give consideration to the relative extent of the property owned by each which is used in developing the power, for otherwise there would be confiscation of the use of private property.

The determination of the Water Power and Control Commission, adopted October 9, 1930, should be annulled, and the matter remitted to the Water Power and Control Commission.

VAN KIRK, P. J., and CRAPSER, J., concur; RHODES, J., dissents, with an opinion in which McNAMEE, J., concurs.

RHODES, J. (dissenting). We may all agree that "petitioner, by availing itself of the privileges granted in chapters 596 and 597 of the Laws of 1918, assumed the reciprocal burdens, among them being that of paying an equitable rental for the water diverted in excess of 15,100 cubic feet per second." The terms of said statutes then became a compact between the State and the petitioner and its predecessors in title. Unquestionably the State at that time was vested with rights either proprietary or in sovereignty in the waters of the Niagara river. The conflicting rights of the State and the petitioner and its predecessors were disputable. The grants themselves, the voluminous record here and the able briefs of eminent counsel are sufficient evidence of the controversial nature of the rights involved. Such controversy in and of itself furnished sufficient consideration to support the recognition and acknowledgment by petitioner of the fact that the State possessed rights therein, and affords adequate foundation for the implied promise on the part of the petitioner to pay an equitable rental for the diversion specified.

There is a presumption that the public officials have properly discharged their duties herein and that the order under review is valid and proper. In attacking such order the burden is, therefore, upon the petitioner to establish and point out any invalidity therein.

By subdivision 13 of section 614 of the Conservation Law the Water Power and Control Commission is given power to fix and determine the amount of an equitable rental; pursuant to the reservation made by the acts permitting the incorporation of petitioner, "and which shall be fixed in like manner as if the application was made for a license under the provisions of this article before the water was used." Subdivision 2 of section 616 of the Conservation Law provides that such a license "shall require the payment by the licensee of an annual charge measured by a fair rental value thereof; in other cases, *except where the State has no proprietary interest*, an equitable annual charge may be made, in determining which the Commission *shall give consideration to the cost of producing power by others in competition with the licensee* * * *."

We may abandon at once any further investigation of the value

of such rental measured by the rights of the State under its proprietary interests, because the petitioner by its brief asserts that the State has no such proprietary interest and has failed to meet the burden cast upon it of showing that the rental fixed is improper and excessive measured by such proprietary interest.

We are thus to consider the proposition whether the rental is too high, giving consideration to the cost of producing power by others in competition with petitioner.

It is argued by my associates that rent is dependent upon ownership, not only under this statute but by common law; that rent is the periodic return for the privilege or use and that the usual rule is that the rent of anything shall be somewhat in proportion to its cost or value. Even if the rental involved the question of ownership, the extent of that proprietary interest would not be controlling in determining the rental. The statute contemplates a determination of what the use of the water diverted is worth to the petitioner, not what it is worth to the State. In determining the value thereof to the petitioner, consideration is to be given to the cost of producing power by others in competition with the licensee. I apprehend competition means actual competition taking into account the distances electrical energy may be transmitted and all other factors involved. It appears in the record and it is common knowledge that such competition is not confined to producers and transmitters of power within the area of the city of Niagara Falls, but that it extends over and includes vast areas of the State. We are not now required to state the formula by which the equitable rental value is to be ascertained. Our task is to determine whether the rate fixed by the Commission is excessive.

The petitioner has not met the burden of showing that the rate exceeds the value to it of the diversion; in fact one of the arguments advanced in support of petitioner's contention is that by virtue of the advantages in location it is enabled to produce and transmit at a very low rate.

The petitioner asserts that error was committed in the refusal to permit experts to answer certain hypothetical questions. The exclusion of this proferred testimony was not so prejudicial as to justify a reversal. If it be assumed that the opinion of experts would have been helpful, such opinions would not have constituted facts; they were attempted aids in interpreting facts. Furthermore, the Commission was dealing with a subject concerning which they may be assumed to have special knowledge and information, and the ability to interpret the facts before it. The question to be determined did not involve the opinion of experts, but it involved facts

as to the cost of production, the distance the power is and may be transmitted, and the extent to which petitioner must meet competition.

The determination should be confirmed, with costs.

McNamee, J., concurs.

Determination annulled and matter remitted to the Water Power and Control Commission.