STATE of Alaska and Don Wilson, Appellants and Cross–Appellees,

v.

Riley T. MORRY and Kwethluk Ira Council, Appellees and Cross–Appellants.

Nos. S–4632, S–4660.

Supreme Court of Alaska.

July 10, 1992.

Rehearing Denied Aug. 13, 1992.

Stephen M. White, Asst. Atty. Gen., Charles E. Cole, Atty. Gen., Juneau, for appellants/cross-appellees.

William E. Caldwell, Fairbanks, Carol A. Daniel, Anchorage, Alaska Legal Services Corp., for appellee/cross-appellant, Morry.

John Sky Starkey, Bethel, for appellee/cross-appellant, Kwethluk IRA Council.

Eric Smith, Anchorage, for Arctic Regional Council and Ninilchik Traditional Council, amici curiae.

Robert T. Anderson, Native Americans Rights Fund, Anchorage, for Kluti Kaah Native Village of Copper Center, amicus curiae.

Michael A.D. Stanley, Juneau, for United Cook Inlet Drift Ass'n, amicus curiae.

## OPINION

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON, and MOORE, JJ.

RABINOWITZ, Chief Justice.

## INTRODUCTION

Alaska's big game tag regulation requires a brown bear hunter to purchase a numbered, nontransferable tag before hunting and then, after taking a bear, affix and keep the tag on the animal until it is stored, consumed, or exported from the state. 5 AAC 92.012(c). Brown bear sealing regulations require that a hunter keep the skin and skull of a bear if taken in certain game management units, and within thirty days, have a state official stamp a seal on these parts. At sealing, the official obtains a tooth from the skull, and the hunter signs a sealing certificate. 5 AAC 92.165.[1] At issue in this appeal is the validity of these regulations under Alaska's subsistence preference law.

In July 1985, appellee/cross-appellant, Riley T. Morry, an Inupiat subsistence hunter, was charged with shooting a brown bear without complying with the above regulations. As a result of a criminal prosecution brought against him for failure to comply with the regulations (later dismissed), Morry filed for declaratory relief and damages against the State of Alaska and Trooper Don Wilson, challenging the validity of 5 AAC 92.012 and 5 AAC 92.165 under both federal and state subsistence laws.

Kwethluk IRA Council is the governing body for the Yup'ik Eskimos of the Native Village of Kwethluk which is located in the Lower Kuskokwim area of Southwest Alaska. Kwethluk intervened in this case following unsuccessful rule-making proposals it had made to the Board of Game seeking changes in various regulations which were being applied to the subsistence hunting of brown bears by the people of Kwethluk.

## FACTS & PROCEEDINGS:

On June 30, 1984, Morry obtained a $25 Alaska brown/grizzly bear tag and a "Gates of the Arctic National Park Grizzly Bear Hunting Permit No. 6 from Alaska Division of Fish and Game's (ADF & G) designated agent in Anaktuvuk Pass." The $25 bear tag expired on December 31, 1984; however, it did not state that it expired less than 12 months after purchase. The Gates of the Arctic permit stated that it was valid from July 1, 1984 through June 30, 1985.

In May 1985, Morry killed a grizzly bear and distributed the meat to various households. Morry also notified the ADF & G agent that he had taken the bear. Subsequently, the agent went to Morry's house and "sealed" the bear hide with a metal tag, and filled out an ADF & G "sealing certificate" form. The agent did not "seal" the bear skull with a metal tag because it needed cleaning.

Upon learning of this bear harvest, Trooper Don Wilson initiated an investigation and proceeded to file a criminal complaint against Morry charging him with four misdemeanors—failure to obtain a "locking tag," failure to affix such a tag, failure to obtain a permit, and failure to seal the skull—and recommending punishment of 30 days in jail and a $800 fine. The State voluntarily dismissed the criminal charges against Morry on October 16, 1985. Morry continued to challenge the two regulations under federal and state subsistence laws.

Subsequent to the original briefing in the superior court, this court struck down the "rural preference" of the 1986 subsistence law in *McDowell v. State*, 785 P.2d 1 (Alas-

---

1. The penalty for violation of these state regulations is a misdemeanor conviction punishable by a "fine of not more than $1,000, or by imprisonment for not more than six months, or both." AS 16.05.430(a). The regulations provide that these penalties can be imposed on a strict liability theory—"regardless of [the] person's intent." 5 AAC 92.002.

ka 1989). After further briefing, the superior court preliminarily invalidated the challenged regulations and granted the board 90 days within which to review the application of the regulations to subsistence uses under Alaska's subsistence laws as construed in its decision. Judge Jeffery based his decision on a finding that the Board of Game had failed to analyze the applicability of these regulations to subsistence uses under the 1986 subsistence preference law, AS 16.05.258(c), and hence had violated both the subsistence preference law and the Administrative Procedures Act. Of particular significance is the superior court's conclusion that the board had been applying trophy or general big game hunting regulations to subsistence uses without conducting any analysis of the effect these regulations were having on subsistence uses.

As guidance for the board when reviewing the regulations, the superior court addressed and rejected Morry's contention that it was impermissible for the board, at the first-tier level, when the resource is sufficiently abundant to satisfy all subsistence uses, to impose any regulatory restrictions upon customary and traditional patterns and practices of resource harvesting. The court rejected this argument on the basis that the 1986 statute specifically states that: "[t]akings authorized under this section are subject to reasonable regulation of seasons, catch or bag limits, and methods and means." AS 16.05.258(f). However, the superior court found that the manner of such regulating is still subject to special protection for subsistence uses.

> If the state is allowed to issue complex regulations for subsistence uses—violation of which can result in substantial fines or jail time—the protection given to subsistence uses can be eroded just as surely as if the numbers of game available for subsistence uses were sharply reduced or eliminated. When the state undertakes such regulation, it must show that the requirements fulfill the goals of 'conservation, development, and utiliza-

tion' of the game resource and that the regulations are the least intrusive means available to accomplish these goals.[2]

Thereafter, the state moved for an extension of time of the 90–day deadline for action by the Board of Game and also asked for a stay pending appeal. Morry opposed the state's motion, and in addition, moved for further relief (as to the board's adoption and implementation of its "all Alaskans" policy), and for the entry of judgment pursuant to Civil Rule 54(b).

On May 18, 1991, the court granted Kwethluk's motion for leave to intervene *nunc pro tunc* to May 24, 1990. On May 23, 1991, the court entered judgment and filed a decision denying the state's motion for any further extension of time, and granted in part the motions of Kwethluk and Morry for further relief.

In its decision, the superior court permanently invalidated the regulations (subject to the right of the board to conduct the review required by the October 1990 decision) and enjoined application of the regulations to subsistence brown bear hunting in the game management units (GMU) at issue. The court stated:

> This court has expected Board of Game compliance so that the court and the public would have had the benefit of the board's expertise in evaluating the continuing validity of these regulations as applied to subsistence uses of brown/grizzly bear in the particular game management units at issue in this case. October 16th Decision at 24–25. Since the Board of Game apparently finds it impossible to undertake this review until its March, 1992, meeting, the court has no alternative but to craft an interim order regulating subsistence hunting of brown/grizzly bear in Game Management Units 17A, 17B, 18, 19A, 19B, 24, and 26, pending board action and court review, as discussed later in this memorandum. The interim regulations and the interim finding of invalidity of

**2.** The superior court drew that standard from comparable provisions of ANILCA, and from the "customary and traditional use" standard of

the state-law definition of subsistence uses, AS 16.05.940(31).

the existing regulations are necessary to protect subsistence hunters from prosecution under an invalid regulatory scheme as applied to subsistence use of brown/grizzly bear in these game management units.

The superior court then directed the State to implement a system allowing subsistence users hunting in these GMUs to each take one bear per year, but with the requirement that a harvest report be submitted to ADF & G within fifteen days of a taking, as set forth for moose taken for funeral potlatches in 5 AAC 92.019. The court reasoned that "[t]his manner of interim regulation is likely to yield greater information for the Department concerning brown/grizzly bear usage in North and Northwest Alaska than the current regulations." The court further noted that "[t]he existence of the interim regulatory scheme will eliminate the problem of unregulated subsistence hunting discussed in [*State v.*] *Eluska*," 724 P.2d 514, 516 (Alaska 1986).

Additionally, the superior court declared invalid the Joint Boards' policy statement declaring that "all Alaskans are now eligible subsistence users," and its corollary that all subsistence regulations must have state-wide uniformity,

> unless interpreted to mean that 'all Alaskans are *eligible to be considered* subsistence users' *if,* prior to subsistence hunting, their individual use of fish and game meets criteria for 'noncommercial, customary and traditional' subsistence uses of the particular fish and game population being harvested, under criteria established by regulation such as 5 AAC 99.010(b).

(Emphasis in original.) The court also rejected plaintiff's challenge to the Joint Boards' action in repealing and modifying certain provisions of the "eight criteria regulation," 5 AAC 99.010(b), concluding that "[a] fair reading of the *McDowell* decision ... supports these actions taken by the Joint Boards."

The state now appeals from the superior court's invalidation of the regulations, the form of remedy granted by the court, and its ruling on the "all Alaskans" policy. Morry and Kwethluk cross-appeal the superior court's holdings that the changes to the eight-criteria regulation are valid, and also the implication in the superior court's ruling that under *McDowell* only individual, not community-based, patterns of use may be protected.[3]

## I. DID THE SUPERIOR COURT ERR IN INVALIDATING THE CHALLENGED REGULATIONS?

■ Morry and Kwethluk assert that the challenged brown bear regulations were adopted by the Board of Game without consideration of, or compliance with, the applicable laws relating to subsistence. The central point of their argument is that AS 16.05.258(c) commands that the Board of Game "shall adopt ... *subsistence* hunting regulations for each ... population for which a harvestable portion is determined to exist." (Emphasis added.) Morry and Kwethluk submit that the "noncommercial, customary, and traditional uses" standard contained in the definition of "subsistence uses" in AS 16.05.940(30) is plainly related to non-trophy uses that are "for direct personal or family consumption as food, shelter, fuel, clothing, tools or transportation,"

---

**3.** Both parties agree that issues concerning the interpretation of Alaska's subsistence laws are reviewable de novo.

The "arbitrary, unreasonable, and abuse of discretion" standard is applied to cases where the validity of a regulation is challenged, i.e., to cases in which the issue concerns the agency's exercise of its quasi-legislative authority. *Kelly v. Zamarello,* 486 P.2d 906 (Alaska 1971). As originally set forth in *Kelly,* 486 P.2d at 911, and later applied in *Kenai Peninsula Fisherman's Co-op. Ass'n, v. State,* 628 P.2d 897, 906 (Alaska 1981), this Court applies a test which involves a four-fold inquiry: was the regulation adopted in

accordance with APA procedures; is the regulation within the discretion vested in the agency by the legislature; is the regulation consistent with the statute and reasonably necessary to its purpose; is the regulation reasonable and not arbitrary. *Kenai,* 628 P.2d at 906.

The superior court's grant of remedial relief is reviewed under the abuse of discretion standard. *Peter Pan Seafoods, Inc. v. Stepanoff,* 650 P.2d 375 (Alaska 1982). "Absent a definite and firm conviction that the judge made a mistake, we will not overturn a decision left to the discretion of the trial court." *City of Kenai v. Ferguson,* 732 P.2d 184, 190 (Alaska 1987).

for the "making and selling" of handicrafts, and for "customary trade, barter, or sharing." [4]

Morry and Kwethluk argue that in order for a reviewing court to insure both that the agency has in fact taken a "hard look" and that the courts are able to perform their judicial-review obligations, non-adjudicative decisions of an agency must be supported by an adequate decisional document. *Citing Peninsula Marketing Ass'n v. State*, 817 P.2d 917, 923 (Alaska 1991), *quoting Messerli v. Department of Natural Resources*, 768 P.2d 1112, 1118 (Alaska 1989).[5] Here they point out that this court is completely disabled from reviewing the subject regulations for consistency with the subsistence laws, because the APA rulemaking hearing, which would have provided a record demonstrating careful consideration of the applicable subsistence laws, was never held. Accordingly, Morry and Kwethluk contend that the superior court did not err in finding that the application of the regulations to subsistence uses is wholly arbitrary and thus invalid.

The State and Wilson do not directly address the issue of whether the regulations violate the APA or the subsistence preference laws. Instead, they assert that the superior court employed an incorrect analysis in its review of the questioned big game fee and bear sealing regulations. They argue that the superior court erred in substituting its judgment for the board's judgment in an area "where highly specialized agency expertise is involved." *Citing Meier v. State*, 739 P.2d 172, 174 (Alaska 1987). The State and Wilson assert that the superior court invalidated the regulations because they do not generate enough information. In this regard they argue that the superior court acknowledged that there was some compliance with the regulations and that as a consequence, some information was collected. Given this function, they argue that the regulations were reasonable, not arbitrary. "How well they served this purpose was not a proper inquiry of the superior court."

As noted above, AS 16.05.258(c) mandates that the Board of Game "shall adopt *subsistence* ... hunting regulations for each ... population for which a harvestable portion is determined to exist". (Emphasis added.) Given this command, we conclude that Morry and Kwethluk's argument, that these trophy hunting regulations do not constitute compliance with the requirement of AS 16.05.258(c) that the Board of Game adopt subsistence hunting regulations for the game in question, is persuasive. In particular, we find compelling the following arguments which were advanced by Morry and Kwethluk:

[w]hatever the 'noncommercial, customary and traditional uses' standard of the definition of 'subsistence uses' in AS 16.05.940(30) may mean, it is plainly related to non-trophy uses that are 'for direct personal or family consumption as food, shelter, fuel, clothing, tools or transportation,' for the 'making and selling' of handicrafts, and for 'customary trade, barter or sharing.' There is no hint that hunting for trophies is a subsistence use....

Many people, both residents of the state and non-residents, hunt grizzly bears for trophies and leave the meat at the kill site ... But it is not a subsistence use, and plaintiffs have contended throughout that it is manifestly unreasonable to apply the regulatory regime designed to govern such trophy-hunting practices to the uses in those places, such

**4.** Additionally, Morry and Kwethluk insist that if the mandate of § 16.05.258(c), that the board's "regulations shall provide a reasonable opportunity to satisfy the subsistence uses," is anything more than meaningless, then a regulation limiting subsistence uses to "one bear every four years" must fall.

**5.** In support of this contention they quote *Johns v. Commercial Fisheries Entry Comm'n*, 758 P.2d 1256, 1261 (Alaska 1988) which explained:

[W]hen an agency promulgates a regulation, the record should at least explain the reasons for the agency's action. This is necessary so that we can meaningfully fulfill our statutory and constitutional review functions. Where the Administrative Procedure Act is followed, such a record is likely to exist—especially if the agency position is expressed at the hearing required under AS 44.62.210(a).

as Kwethluk and Anaktuvuk Pass, where brown bears are hunted for the meat and raw materials.[6]

(Footnote omitted.)

■ Alternatively, we uphold the superior court's invalidation of the questioned regulations on the ground that these regulations were adopted by the board in violation of the Administrative Procedure Act (APA).[7] Alaska Statute 16.05.255(a) grants the board authority to "adopt regulations it considers advisable in accordance with the APA." [8] Thus, it is undisputed that it is within the board's rule making powers to consider the applicability and adoption of these questioned regulations to subsistence uses, provided appropriate public notice has been given. AS 44.62.190(a), 16.05.255, 16.-05.258(b). Here Morry and Kwethluk correctly note that no hearing was ever held regarding the challenged regulations for consistency with the subsistence law prior to their adoption as subsistence regulations. Given this absence of any hearing, we conclude that the superior court's holding invalidating these tag/fee and sealing regulations, as subsistence regulations applicable to the taking and use of brown/grizzly bears in the affected game management units, should be sustained.

## II. DID THE SUPERIOR COURT ERR IN USING THE "LEAST INTRUSIVE" STANDARD?

■ The superior court noted that the "least intrusive" standard must be implied as a rule of construction for the "reasonable opportunity" language of the 1986 state subsistence law.

The State and Wilson argue that the written words of the subsistence law only mention "reasonable opportunity" in two places, and in neither location does the text mention "least intrusive." The State also points to the relevant legislative history, and submits that, as the subsistence law was being developed, "reasonable opportunity" was explained twice. (*See* Memorandum from Senate Resources Committee Staff to Senate Resources Committee Members (March 12, 1986); Address by Senator Vic Fischer to the Alaska State Senate (May 9, 1986)). However, on neither occasion was the "least intrusive" standard mentioned. The State further argues that the "least intrusive" standard is absent in the three logical places in the statute where the fish and game laws deal with the regulations of subsistence hunting and fishing.

The State contends that the superior court's reliance on ANILCA is flawed. It bases this contention on the proposition that although the subsistence law was enacted in part to comply with ANILCA, "each law is a separate piece of legislation with its own legislative history and distinct provisions." The State argues "[t]he term that the superior court says is modified by the 'least intrusive standard'—the 'term reasonable opportunity'—does not even appear in the federal law." *See* 16 U.S.C.A. § 3111–3126 (1985).

The State next argues that since state law is now out of compliance with ANILCA, the state is no longer implementing federal policy on federal "public lands." Hence, the purpose statement of ANILCA (from which the superior court derived the "least intrusive" standard) should not af-

---

6. To be valid a regulation must be consistent with the authorizing statute and reasonably necessary to carry out the statute's purpose. *Trustees for Alaska v. State, DNR*, 795 P.2d 805, 812 (Alaska 1990).

   *Compare* Justice Compton's dissent in *State v. Eluska*, 724 P.2d 514, 518 (Alaska 1986) where he states:

   > As indicated, § 255(b) grants the right to subsistence hunt and requires the board to adopt separate regulations. The general hunting regulations are vague when read in light of § 255(b) since they do not cover subsistence uses.... (Footnote omitted.)

7. We have held that the board "is required to follow APA procedures where adopting regulations pursuant to its statutorily delegated authority." *Kenai Peninsula Fisherman's Co-op. Ass'n, Inc. v. State*, 628 P.2d 897, 904 (Alaska 1981).

8. *See also*, AS 16.05.094(6) which requires the Division of Subsistence, Department of Fish and Game to "make recommendations to the Board of Game and the Board of Fisheries regarding adoption, amendment and repeal of regulations affecting subsistence hunting and fishing."

fect the state's implementation of its own law on its own lands. The State further argues that the "least intrusive" standard applies to the use of land, and the use of land is addressed in a section of ANILCA (§ 3120) that is entirely separate from the sections of ANILCA that deal with the use of subsistence fish and game—16 U.S.C.A. §§ 3113–3117 (1985).

The State's final argument is that the "least intrusive" standard would require a significant change in the method the boards use to adopt regulations. In this regard the State submits that since the boards are not required to provide for a certain style of hunting and fishing, there is nothing that can be intruded upon.

Morry and Kwethluk argue that the "least intrusive" standard is the appropriate one for insuring board compliance with the law. They support this position by stressing that the subsistence law does more than merely direct the boards to take subsistence into account in the course of making regulations. The law mandates that those uses be given preference over all others.

Morry and Kwethluk also assert that the State errs in looking to the statute for the words "least intrusive", because the key word in the statute is "preference". They submit that the question before the superior court, and the one presented here, is what standard the courts insist upon to insure that the mandatory preference is in fact being accorded.

Morry and Kwethluk contend that the superior court drew the least intrusive standard from the overall structure and intent of the statute, from the judicial construction of the comparable provisions of ANILCA, and from analogous areas of law in which hunting and fishing rights are accorded a priority in law. They emphasize that the "reasonable opportunity" that the legislature requires is not merely some abstract opportunity; it is, rather, a priority opportunity.

We find the State's arguments persuasive. The least intrusive standard is not explicitly mentioned in the text of our subsistence preference laws nor can such a standard be reasonably implied from the fact that the subsistence law accords a "preference" to subsistence users. As the State notes:

> The subsistence law, however, provides a preference only by giving subsistence users 'reasonable opportunity' to harvest the resource. If this 'reasonable opportunity' defined according to customary and traditional harvest levels, reasonable expectations, and access—cannot be furnished because of the demands of other user groups, then these other groups must be cut out. This is how the priority arises, not through Morry's elusive standard of judicial review.

## III. DID THE SUPERIOR COURT ERR IN INVALIDATING THE STATE'S INTERPRETATION, FOLLOWING McDOWELL, THAT AS 16.05.258 PROVIDES NO STATUTORY GROUNDS FOR DISTINGUISHING BETWEEN BENEFICIAL USERS AT THE FIRST TIER LEVEL?

■ The State and Wilson contend that the state subsistence law does not authorize or give guidance to the boards of fish and game on how to determine which individuals may engage in "first tier" subsistence hunting and fishing. The State first advances an historical argument based on the legislative evolution of the subsistence statute. The State asserts that under the original 1978 subsistence law, when there was enough fish and game for all subsistence uses, i.e., at the "first tier" of abundance, there was no authority for the boards of fish and game to decide that some Alaskans could be subsistence harvesters, but others could not. Only at the second tier level, when resources declined below a level where all subsistence uses could be satisfied, did the board have authority to establish criteria for differentiating between users.

The State notes that the board's attempt to differentiate between first tier users through the imposition of a rural/nonrural distinction failed upon review by this court. *Citing Madison v. Alaska Dept. of Fish and Game*, 696 P.2d 168, 174 (Alaska

1985). The board had argued that it had statutory authority under the "customary and traditional" phrase of AS 16.05.940(31) (formerly AS 16.05.940(23)) to define first tier subsistence users by their area of residence. *Id.* In *Madison* we rejected the board's contention and held:

> First, the argument ignores the two-tier structure of AS 16.05.251(b) that defines only the second-tier subsistence users in terms of residency. If the legislature had intended to define the class of first-tier general subsistence users by area of residence, it would not have expressed that factor with respect to only the second tier of preferred subsistence users. Moreover, the phrase 'customary and traditional' modifies the word 'uses' in AS 16.05.940(23). It does not refer to users. The 1978 subsistence law refers to 'customary users' at only one point, when it defines the preferred subsistence users of the second tier with the three statutory criteria in AS 16.05.251(b).
>
> . . . .
>
> The legislative history indicates that the legislature intended to protect subsistence use, not limit it. The words "customary and traditional" serve as a guideline to recognize historical subsistence use by individuals, both [N]ative and non-[N]ative Alaskans. In addition, subsistence use is not strictly limited to rural communities. For these reasons, the board's interpretation of 'customary and traditional' as a restrictive term conflicts squarely with the legislative intent.[9]

When the legislature thereafter attempted to amend the 1978 subsistence law to add statutory authorization for distinctions between individuals at the first tier this court

invalidated the rural/urban distinction as violative of sections 3, 15 and 17 of article VIII of the Alaska Constitution.[10]

On remand in *McDowell* the superior court severed the rural criteria from the law, but left the subsistence mandate and priority in place. *McDowell v. Collinsworth,* No. 3AN–83–1592 Civil (Alaska Super., July 12, 1990). The State observes that following *McDowell,* the four superior courts that have attempted to distinguish between first tier eligibility users, have all fallen into the trap of applying "customary and traditional" to *users* not *uses,* inconsistent with this court's mandate in *Madison.* The State contends that this interpretation doesn't work, for

> If only residents who have customarily and traditionally used subsistence resources can continue to harvest them in the future, existing Alaskans who had not used subsistence resources, as well as all future Alaskans, would not be eligible to participate in subsistence harvests. Surely, this could not satisfy the common use mandate of article 8, section 3, of the Alaska Constitution. *See Owsichek v. State,* 763 P.2d 488 (Alaska 1988).

The State next argues that the present subsistence law does not contain statutory authorization allowing the boards to adopt criteria that will eliminate some Alaskans as eligible first tier subsistence users. The State notes that in *McDowell,* this court spoke of "individual characteristics" as a system that may be enacted, not as a system that already exists for first tier eligibility. 785 P.2d at 9. Moreover, the State contends that if individual criteria were used to distinguish first tier users, this would violate the rule known as expressio

---

**9.** *Madison,* 696 P.2d at 174, 176.

**10.** *McDowell v. State,* 785 P.2d 1, 9 (Alaska 1989). In so holding we noted:

> The conclusion we have reached does not mean that everyone can engage in subsistence hunting or fishing. We do not imply that the constitution bars all methods of exclusion where exclusion is required for species protection reasons. We hold only that the residency criterion used in the 1986 act which conclusively excludes all urban residents from subsistence hunting and fishing regardless of

their individual characteristics is unconstitutional.

> We are not called upon in this case to rule on what selection criterion might be constitutional. It seems appropriate, however, to note that any system which closes participation to some, but not all, applicants will necessarily create a tension with article VIII. In such cases, assuming that the exclusionary criterion is not per se impermissible, our decisions suggest that demanding scrutiny is appropriate.

unius est exclusio alterius. ·The State explains that "[t]his rule says that to enumerate specific terms specifically excludes those which are not enumerated." The State points out that this court followed the reasoning of this rule in *Madison* when it stated: "If the legislature had intended to define the class of first tier general subsistence users by area of residence, it would not have expressed that factor with respect to only the second tier of preferred subsistence users." 696 P.2d at 174. The State argues that "[l]ikewise, had the 1986 legislature intended to define the class of first tier general subsistence users by both area of residence *and* by individual characteristics, it would not have expressed individual i.e., dependency, local residence and availability of other resources, with respect to only the second tier of preferred subsistence users." Based on these arguments, the State concludes that the superior court erred in invalidating the State's policy that all Alaskans are now eligible, since *McDowell*, to become first tier subsistence users.

Morry and Kwethluk argue that the superior court correctly invalidated the "all Alaskans policy." They do not dispute that following *McDowell*, all Alaska residents, be they rural, urban or suburban, are eligible to participate in subsistence uses on lands and waters over which the state continues to have jurisdiction. Morry and Kwethluk submit that the issue to be resolved is whether the law (with its rural preference provisions severed) not only makes all residents eligible to participate in subsistence uses, but also makes them automatically eligible to go anywhere in the state and participate in any previously recognized local subsistence use.

Morry and Kwethluk submit that the fallacy of the State's position is best illustrated by comparing it with the "acknowledged meaning of the law prior to *McDowell*." Under the 1986 law, "all rural Alaskans" were eligible to be first tier subsistence users. They contend that even under the 1986 law, villagers from Kwethluk could not travel to the area of Anaktuvuk Pass to hunt grizzly bears as subsistence hunters, or vice versa. Morry and Kwethluk further argue that the reason why residents of one region could not travel to another region and engage in subsistence uses was not based on the character ("rural" or "urban") of their respective places. Instead, it was based upon the statutory definition of subsistence uses as "customary and traditional uses" (AS 16.05.940(31)), and upon the application of the eight criteria (5 AAC 99.010(b)) the board adopted in 1982 for identifying such uses.[11]

Morry and Kwethluk assert that following *McDowell*, the State modified its subsistence policy without making new findings with respect to subsistence patterns of the previously excluded class of urban users. They contend that because the boards have embarked on the "all Alaskan policy," having arbitrarily modified the "customary and traditional use" findings of 5 AAC 99.025 so as to make all residents automatically eligible to participate in any recognized subsistence hunt, there are no longer enough bears to satisfy all users.

Morry and Kwethluk next argue that the essence of Judge Cutler's clarification orders and final judgment was that the subsistence statute still had legal effect, even after the unconstitutional portions had been severed. *See McDowell v. Collinsworth*, No. 3AN–83–1592 Civil (Alaska Super., June 20, 1990). The board's response, however, was to express the "contention that ˙the courts have required action to identify subsistence users which is impossible to comply with at this time under these legal constraints." Policy Statement # 90–18–JB (October 28, 1990). "The boards therefore asserted that they 'have no other option than to apply the standard that all Alaskans are now eligible subsistence

---

11. Morry and Kwethluk stress that application of the eight criteria resulted in the determination, for example, that the residents of Kwethluk (located in GMU 18) were eligible to hunt brown bears for subsistence purposes only in nearby GMUs 17(A), 17(B), 18, 19(A) and 19(B).

*See* 5 AAC 99.025(2), July 1991 Cumulative Supp. at 243–44. Similarly, Anaktuvuk Pass residents (located just within the northern boundary of GMU 24) were eligible to subsistence hunt brown bears only in nearby GMUs 24 and 26. *Id.* at 244.

users under Tier I during the upcoming regulatory cycle.'" *Id.*

Contrary to the State's position, Morry and Kwethluk contend that the "customary and traditional use" standard of the subsistence law was intended to, and does, provide grounds for distinguishing among different patterns of subsistence resource harvest and disposition on the basis of local area customs and traditions, and for differentiating between differently situated subsistence user groups on the grounds of their respective traditional use patterns (as distinguished from their places of residency). Morry and Kwethluk assert that this methodology is not unconstitutional, nor does it run afoul of *McDowell*, "and is in fact the system contemplated by the law— as the superior court has held."

On the basis of the parties' arguments, our relevant decisions, and upon consideration of the applicable statutory provisions, we conclude that the superior court erred in its determination as to who is eligible to participate in subsistence hunting and fishing at the first tier. Simply stated, after *McDowell* there are no statutory standards for determining those individuals who are ineligible to participate in subsistence hunting and fishing.

Prior to our decision in *McDowell* only rural Alaskans were eligible to participate in subsistence hunting and fishing. Post *McDowell*, and under the current subsistence statute as impacted by *McDowell*, all Alaskans are eligible to participate in subsistence hunting and fishing. Under the holding of *Madison*, the board lacks the authority to adopt eligibility criteria for first tier subsistence users absent specific statutory authorization. As the subsistence statute presently stands (post *McDowell*) there are no legislatively enacted standards of eligibility for first tier subsistence users. Given this absence of specific authorization, we hold that the board lacks the authority to adopt eligibility criteria for first tier subsistence users.

In reaching the above conclusions we have in essence adopted the State's analysis of this issue. More particularly, in part we adopt the following reasoning advanced

by the State: By virtue of the legislature's enactment of chapter 151 SLA 1978 (the predecessor to the current subsistence statute) two tiers of subsistence users were created. At the first stage, if sufficient wild resources exist, then all Alaskans were eligible to engage in the subsistence harvests of fish and game. In the event of a species or resource insufficiency, the board was empowered to establish eligibility criteria based on customary dependence, local residency and unavailability of alternative resources. In 1980 the board adopted ten criteria in an attempt to eliminate some Alaskans from the first tier of subsistence users. In 1985 in *Madison* (as noted above) this court rejected the board's contention that it possessed the statutory authority under the "customary and traditional" phrase of AS 16.05.940(31) (formerly AS 16.05.940(23)) to define first tier subsistence users by area of residence. 696 P.2d at 174. In so doing it was stated that "the phrase 'customary and traditional' modifies the word 'uses' in AS 16.05.940(23). It does not refer to users." *Id.* After *Madison* all Alaskans were eligible to participate in subsistence harvests and uses of fish and game.

In response to *Madison* the legislature amended the 1978 subsistence law to restrict subsistence harvests and uses at the first tier to rural residents. Given *McDowell's* holding that this rural criterion was unconstitutional, all Alaskans are once again eligible to participate in first tier subsistence harvests and uses. In brief, *Madison* contradicts any implication that the board has statutory authority to adopt eligibility standards for first tier subsistence users.

IV. DOES THE STATE SUBSISTENCE LAW REQUIRE THE BOARDS OF FISHERIES AND GAME TO PROTECT THE CUSTOMARY AND TRADITIONAL CHARACTER OF SUBSISTENCE HUNTING AND FISHING, INSOFAR AS THESE CUSTOMS AND TRADITIONS ARE SUBJECT TO THE REGULATORY JURISDICTION OF THE BOARDS?

The State takes the position that the subsistence preference law does not re-

quire the boards of fish and game to protect the customary and traditional character of subsistence hunting and fishing. The State contends, however, that the boards have discretionary authority to do so under their general authority to regulate the methods and means of pursuing, capturing, and transporting fish and game. AS 16.05.251(a)(4), AS 16.05.255(a)(6).[12]

The State argues that the superior court's interpretation, that the boards are required to protect the customary and traditional character of subsistence hunting, is not supported by the literal language of the subsistence preference law.

> In AS 16.05.258(a), 'customary and traditional' is used to define the fish stocks and game populations that are subject to subsistence uses. Elsewhere, these words are used to define how subsistence fish and game are *used*, that is, how these resources are consumed *after they are harvested.* AS 16.05.940(31).

(Emphasis in original.) The State further contends that the superior court failed to distinguish the taking of subsistence resources—which is *not* limited to "customary and traditional" methods and means—from the use of these resources after they have been taken.

The State also contends that the superior court was incorrect when it concluded that the subsistence law does not just preserve an amount of fish and game for subsistence users. It insists that AS 16.05.258 requires the boards to first identify stocks and populations, then determine what portions can be harvested consistent with sustained yield. The boards next must determine how much is needed to provide a reasonable opportunity to satisfy subsistence uses. When the law describes the subsistence priority, it consistently refers

to harvestable portions. AS 16.05.258(c). The State concludes that in essence, the subsistence law describes a process for determining a quantitative amount of fish and game that will provide subsistence users with a "reasonable opportunity" to satisfy their customary and traditional consumptive uses. It does not require that the boards preserve a qualitative way of harvesting these resources.

Morry and Kwethluk counter that the subsistence law broadly protects the customs and traditions, as well as the needs, of subsistence users insofar as these customs and traditions are subject to the regulatory jurisdiction of the boards.

Morry and Kwethluk submit that it has been recognized from the beginning that the "customary and traditional" concept of subsistence involves more than merely what is done with the resource after it is harvested. They support their contention by quoting from a decision rendered by this court, contemporaneously with the passage of the initial subsistence law:

> For hundreds of years, many of the Native people of Alaska depended on hunting to obtain the necessities of life. . . . A few non-Natives have adopted similar means of livelihood. . . . Not only is the game of prime importance in furnishing the bare necessities of life, but subsistence hunting is at the core of the cultural tradition of many of these people. It has been claimed that their very lifestyle is threatened if they are deprived of this traditional method of obtaining the wherewithal for existence.

*State v. Tanana Valley Sportsmen's Ass'n,* 583 P.2d 854, 859 n. 18 (Alaska 1978); *see also McDowell,* 785 P.2d at 19 n. 13 (Rabinowitz, J., dissenting).[13]

---

**12.** The State claims it has used this discretionary authority to allow traditional harvesting practices. For example, 5 AAC 92.080(4) and 5 AAC 92.080(5) allow hunters in GMU 23 to use a motor-driven boat and rimfire weapons to take swimming caribou. 5 AAC 01.320(i) allows herring *roe* on kelp in Bristol Bay to be taken by hand picking and hand operated rakes.

**13.** Morry and Kwethluk also submit that their position is supported by a Subsistence Position Paper, the product of discussions between ADF

& G and the Department of Law, which considered definitions of "custom" and "tradition" in the context of the statute, and concluded as follows:

> It is suggested that it is the historic use pattern that is to be accorded a priority in regulation. The use pattern for Tier I is made up of a number of *elements* needing consideration (e.g., areas, times, methods and means, species, stocks, productivity, efficiency, and so

Morry and Kwethluk assert that these patterns, customs, and traditions have been identified through application of the eight criteria, which the legislature approved when it amended the law. In their view these criteria describe more than mere consumption of the resource. "[T]hey appear to attempt, at least, to incorporate most aspects of use, including those that take place before, during and after harvest, such as handing down hunting skills and values, cultural and social importance, seasonal patterns, and the like."

Morry and Kwethluk further contend that this court previously struck down a similar argument by the State, designed to manipulate the term "customary and traditional":

> The legislative history indicates that the legislature intended to protect subsistence use, not limit it. The words "customary and traditional" serve as guidelines to recognize historical subsistence use by individuals, both [N]ative and non-[N]ative.... [T]he board's interpretation of 'customary and traditional' as a restrictive term conflicts squarely with the legislative intent.

*Madison,* 696 P.2d at 176 (footnote omitted).

Based on the above arguments, Morry and Kwethluk submit that the superior court's remand instructions directing the board of game to afford reasonable regulatory recognition and protection for the customs and traditions of the people of Kwethluk and Anaktuvuk Pass, in connection with their harvest and utilization of brown/grizzly bears should be affirmed.

We agree with the State's analysis of this issue and with its position that "[c]learly the boards *may* adopt regulations that recognize the needs, customs, and traditions of Alaska residents." [14] (Emphasis in original.) Our holding is not to be taken as a direction to the boards that they should not consider traditional patterns and methods of taking fish and game for subsistence purposes in their formulation of appropriate subsistence regulations. Analysis of the applicable statutory provisions leads us to the conclusion that the boards have the discretion, but are not mandated, to take into consideration the traditional and customary methods of subsistence takings in their formulation of subsistence regulations. Of controlling significance here is the fact that under AS 16.05.940(30) the terms "customary and traditional" define how fish and game are used, not how they are harvested, for subsistence purposes. [15]

## CONCLUSION

In light of the above we AFFIRM the superior court's invalidation of 5 AAC 92.-012(c) (brown bear tag fee requirement) and 5 AAC 92.165 (bear sealing require-

---

on). Evidence on these elements should be considered by the boards.

ADF & G Tech. Paper No. 66 (November 1980) (emphasis in original).

They also rely on certain studies that have been done documenting that "customary and traditional" uses of fish and game encompass broad patterns of activities. *See e.g.* Wolfe & Ellanna, Resource Use and Socioeconomic Systems: Case Studies of Fishing and Hunting in Alaskan Communities, ADF & G Tech. Paper No. 61 (March 1983), *cited* and *quoted* in *McDowell,* 785 P.2d at 5.

**14.** In its opening brief the State elaborated in somewhat greater detail as follows:

Although the subsistence law does not require the Boards of Fisheries and Game to protect the character of subsistence hunting and fishing, this does not mean they are prohibited from doing so. The boards have general authority to regulate the methods and means of pursuing, capturing, and transporting fish and game. AS 16.05.251(a)(4), AS 16.05.255(a)(6). They have used this authority, where it is appropriate, to allow traditional harvesting practices. For example, 5 AAC 92.080(4) and 5 AAC 92.080(5) allow hunters in Game Management Unit 23 to use a motor-driven boat and rimfire weapons to take swimming caribou. 5 AAC 01.320(i) allows herring roe on kelp in Bristol Bay to be taken by hand picking and hand operated rakes. While the boards have authority to provide for certain harvest methods, they are not compelled to do so.

**15.** The author of this opinion and Justice Compton disagree with the court's resolution of this issue for the reasons expressed in the dissent in *State v. Kluti Kaah Native Village of Copper Center,* 831 P.2d 1270 (Alaska, 1992). There we concluded that the provisions of AS 16.05.-940(29) and (30) should be construed to require the boards to consider traditional and customary means and patterns of hunting and fishing in fashioning subsistence regulations.

ment) as subsistence regulations. We RE-VERSE the superior court's holding that the boards' All Alaskans policy for first tier eligibility is invalid. We REVERSE the superior court's adoption of a "least intrusive standard", and REVERSE the superior court's holding that the boards must take into consideration customary and traditional patterns and methods of harvesting game and fish for subsistence purposes in formulating subsistence regulations.

Given these holdings it follows that the superior court's orders establishing bag limits and new reporting requirements for brown bear hunts in the affected areas are VACATED. The matter is REMANDED to the superior court with directions to REMAND to the board for the purpose of promulgating appropriate subsistence regulations in accordance with the procedural requirements of the Administrative Procedures Act.

AFFIRMED in part, REVERSED in part, and REMANDED to the superior court with directions to REMAND the matter to the board for further proceedings consistent with this opinion.[16]

---

**16.** We consider it unnecessary to address any of the remaining issues raised in the appeal and cross-appeal.