Michael TOTEMOFF, Petitioner,

v.

STATE of Alaska, Respondent.

No. S–6151.

Supreme Court of Alaska.

Oct. 20, 1995.

Rehearing Denied Nov. 20, 1995.

Paul E. Malin, Assistant Public Defender, John B. Salemi, Public Defender, Anchorage, for Petitioner.

Joanne Grace, Assistant Attorney General, Anchorage, Bruce M. Botelho, Attorney General, Juneau, for Respondent.

Before COMPTON, C.J., and RABINOWITZ, MATTHEWS, MOORE and EASTAUGH, JJ.

*ORDER*

IT IS ORDERED, SUA SPONTE:

1. Opinion No. 4236 issued in this case on August 7, 1995, is WITHDRAWN.

2. Corrected Opinion No. 4276 is issued today in its place. The corrections are found in the last full paragraph on page 18 and in the first full paragraph on page 26.

Entered by direction of the court at Anchorage, Alaska on October 20, 1995.

Before MOORE, C.J., and RABINOWITZ, MATTHEWS, COMPTON and EASTAUGH, JJ.

*OPINION*

MATTHEWS, Justice.

Subsistence hunter Mike Totemoff shot a deer with the aid of a spotlight in December 1990. The deer was killed on federal land, Naked Island in Prince William Sound. However, Totemoff was in a skiff in navigable waters surrounding Naked Island when he shined his spotlight at the deer and fired the fatal shot.

Totemoff was charged with violating 5 Alaska Administrative Code (AAC) 92.080(7), which prohibits hunting with the aid of an artificial light. Totemoff moved to have the indictment dismissed, arguing that the State did not have jurisdiction to prosecute him and that the regulation prohibiting spotlighting was invalid. To support some of his arguments, Totemoff presented evidence that spotlighting is a customary and traditional means of hunting deer for subsistence in his native community of Tatitlek. The district court ruled that the State did have jurisdiction to prosecute Totemoff. The district court held that Alaska law prohibits subsistence hunters from challenging, in a criminal proceeding, the regulations under which they are prosecuted.

The case proceeded to trial, and Totemoff was convicted. The court of appeals affirmed. *Totemoff v. State*, 866 P.2d 125 (Alaska App.1993). We granted Totemoff's petition for hearing.

■ We must first decide whether the State has criminal jurisdiction over Totemoff, as jurisdiction is a threshold issue which must be decided before this court can address other issues presented in an appeal. *See Nattrass v. State*, 554 P.2d 399, 401 (Alaska 1976). Jurisdiction can be established either by finding that the State has

the power to apply the spotlighting ban to subsistence hunters on federal land, or by determining that the State has exclusive jurisdiction over the navigable waters from which Totemoff fired his rifle. If we find that the State does have jurisdiction, we will then consider Totemoff's state law challenge to the anti-spotlighting regulation.

## I. JURISDICTION OVER FEDERAL LAND

■ A state is free to enforce its civil or criminal laws on federal land within its boundaries unless the state consents to the exercise of exclusive federal jurisdiction, the state voluntarily cedes exclusive jurisdiction to the federal government, or the state's laws are preempted by federal law. *California Coastal Comm'n v. Granite Rock Co.,* 480 U.S. 572, 580–81, 107 S.Ct. 1419, 1424–25, 94 L.Ed.2d 577 (1987); *Kleppe v. New Mexico,* 426 U.S. 529, 542–43, 96 S.Ct. 2285, 2293–94, 49 L.Ed.2d 34 (1976); *see also Arizona v. Manypenny,* 445 F.Supp. 1123, 1125–26 (D.Ariz.1977), *rev'd on other grounds,* 451 U.S. 232, 101 S.Ct. 1657, 68 L.Ed.2d 58 (1981). Alaska has not voluntarily ceded exclusive jurisdiction over hunting on federal land to the federal government or consented to exclusive federal control. Therefore, the State lacks jurisdiction to enforce its spotlighting ban against subsistence hunters on federal land only if enforcement is preempted by federal law.

■ Federal law can preempt state law in three ways. First, Congress may expressly declare that state law is preempted. Second, state law is preempted if Congress intends the federal government to occupy a field exclusively. Third, federal law preempts state law if the two actually conflict. *See, e.g., Wisconsin Pub. Intervenor v. Mortier,* 501 U.S. 597, 604–05, 111 S.Ct. 2476, 2481–82, 115 L.Ed.2d 532 (1991); *English v. General Elec. Co.,* 496 U.S. 72, 78–79, 110 S.Ct. 2270, 2274–75, 110 L.Ed.2d 65 (1990). Totemoff argues that application of the spotlighting ban to him is preempted by the Alaska National Interest Lands Conservation Act (ANILCA), 16 U.S.C. §§ 3101–3233 (1988).

No provision in ANILCA expressly preempts state enforcement of state hunting laws against subsistence hunters on federal land. Thus, we must determine whether Congress intended for the federal government to exclusively occupy the field of regulation of subsistence activities when it enacted ANILCA, or whether state law actually conflicts with ANILCA.

### A. Intent to Occupy Field

Congressional intent to occupy a field can be inferred from a "scheme of federal regulation ... so pervasive as to make reasonable the inference that Congress left no room for the State to supplement it," or if a federal law "touch[es] a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *English,* 496 U.S. at 79, 110 S.Ct. at 2275 (alteration in original) (quoting *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947)).

However, " '[w]here ... the field which Congress is said to have pre-empted' includes areas that have 'been traditionally occupied by the States,' congressional intent to supersede state laws must be 'clear and manifest.' " *Id.* (alteration in original) (quoting *Jones v. Rath Packing Co.,* 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977)). "When considering pre-emption, '[courts] start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.' " *Mortier,* 501 U.S. at 605, 111 S.Ct. at 2478 (quoting *Rice,* 331 U.S. at 230, 67 S.Ct. at 1152).

■ Regulation of hunting is an area that has been traditionally occupied by the states. It is part of the historic police power of states. *See State v. Coffee,* 97 Idaho 905, 914, 556 P.2d 1185, 1194 (1976); *State ex rel. Nepstad v. Danielson,* 149 Mont. 438, 427 P.2d 689, 691 (1967); *see also Montana v. United States,* 450 U.S. 544, 564 n. 13, 101 S.Ct. 1245, 1258 n. 13, 67 L.Ed.2d 493 (1981). Therefore, we may find that Congress intended to occupy the field of regulation of subsistence hunting on federal land only if Congress' purpose was clear and manifest.

■ ANILCA does not disclose such a clear and manifest purpose. Title VIII of ANILCA governs subsistence hunting and fishing. 16 U.S.C. §§ 3111–26. Section 804 of Title VIII requires the taking of fish and wildlife on public lands for subsistence purposes to be accorded priority over the taking of fish and wildlife for other purposes. 16 U.S.C. § 3114. Section 802 states that it is the purpose of Congress "to provide the opportunity for rural residents engaged in a subsistence way of life to do so." 16 U.S.C. § 3112(1). Section 814 requires the Secretaries of Interior and Agriculture to promulgate regulations necessary to carry out their responsibilities under Title VIII. 16 U.S.C. § 3124. Sections 805(a)–(c) of Title VIII provide for the establishment of a network of regional advisory councils and local advisory committees to advise the Secretaries in the exercise of their authority under ANILCA. 16 U.S.C. §§ 3115(a)–(c).

Under § 805(d), the federal government was not to implement §§ 805(a)–(c) if Alaska enacted laws of general applicability providing "for the definition, preference, and participation specified" in Title VIII. 16 U.S.C. § 3115(d). Alaska did enact such laws,[1] but we struck down the rural preference provision of those laws as contrary to the Alaska Constitution in *McDowell v. State*, 785 P.2d 1 (Alaska 1989). As a result, the State fell out of compliance with ANILCA. The federal government subsequently promulgated temporary and then permanent regulations governing subsistence hunting on public land and implementing §§ 805(a)–(c) of Title VIII. 55 Fed.Reg. 27,114 (1990); 57 Fed.Reg. 22,940 (1992).

Even though Title VIII has been fully implemented, it does not create a scheme of federal regulation so pervasive that there is no room for state regulation to supplement it. Under Title VIII, the Secretaries of Interior and Agriculture implement ANILCA's subsistence priority and opportunity provisions with the participation and assistance of local and regional advisory councils. This does not foreclose the State from promulgating hunting and fishing regulations which may affect subsistence hunters on federal land, so

long as those regulations do not conflict with federal laws or regulations. Nothing in Title VIII discloses a clear and manifest purpose to prohibit all state regulation of subsistence hunting. Nothing affirmatively prohibits the State from engaging in such regulation.

Moreover, § 1314 of ANILCA states, "Nothing in this Act is intended to enlarge or diminish the responsibility and authority of the State of Alaska for management of fish and wildlife on the public lands except as may be provided in [Title VIII] of this chapter." 16 U.S.C. § 3202. Again, no provision in Title VIII clearly and manifestly prevents the State from enforcing its general hunting laws against subsistence hunters on federal land.

In addition, § 802(3) of Title VIII provides that the policy of Congress is that "[f]ederal land managing agencies, in managing subsistence activities on the public lands ... shall cooperate with ... appropriate State and Federal agencies." 16 U.S.C. § 3112(3). This section suggests that Congress did not intend a federal regulatory scheme so pervasive that there would be no room for state regulation to supplement it.

Finally, when the federal regulations promulgated pursuant to ANILCA were passed, the federal agencies administering ANILCA explained that the regulations would permit the State to continue to participate in the management of subsistence hunting on public land:

> *[T]hese regulations anticipate an interactive process between the State fish and game regulatory procedure.* The State, because of its constitution, cannot provide a preference for rural residents with customary and traditional use of fish and wildlife as required by ANILCA. *The State can facilitate harvest by rural residents through various regulations dealing <u>with means and methods of take</u> and perhaps other mechanisms.*

If State regulations allow rural residents the opportunity to obtain their customary and traditional take and uses of fish and wildlife resources, the Federal regulations may closely parallel State regulations.

---

1. *See* ch. 151, SLA 1978; ch. 52, SLA 1986.

*The Federal program anticipates a highly cooperative, interactive relationship with the State system.* To the extent that cooperation exists, the Federal program will be able to minimize change to traditional State regulation and management of fish and wildlife.

55 Fed.Reg. 27,114, 27,119 (1990) (emphasis added). Thus, the federal government clearly contemplated that Alaska means and methods regulations, the kinds of regulations at issue in this case, would be effective on federal land.

Since the language of ANILCA does not demonstrate a clear and manifest Congressional intent to preempt all state regulation affecting subsistence hunting and fishing on federal land, and since the federal agencies administering ANILCA have interpreted ANILCA as allowing such state regulation, we hold that Congress did not intend for the federal government to exclusively occupy the field of subsistence hunting and fishing regulation.

### B. *Actual Conflict*

■ We must next decide whether federal law actually conflicts with the enforcement of the state spotlighting ban against Totemoff on federal land. There is no direct conflict between Alaska's anti-spotlighting regulation, 5 AAC 92.080(7), and any federal statute or regulation. At the time of Totemoff's arrest, a federal subsistence hunting regulation virtually identical to the state regulation prohibited taking game with the aid of a spotlight. *Compare* 36 C.F.R. § 242.23(b)(1)(vii) (1990) *with* 5 AAC 92.080(7) (1990).

Totemoff's principal federal claim, however, is that federal law preempts application of the state spotlighting ban to him because federal law allows him to defend against prosecution on the grounds that spotlighting is a customary and traditional method of taking deer, while state law does not permit such a defense.[2] Totemoff relies on *United*

States v. Alexander, 938 F.2d 942 (9th Cir. 1991).

In *Alexander*, the defendants sold herring roe in violation of an Alaska regulation prohibiting sale of herring roe. *Id.* at 944–45. The court held that the defendants were permitted to defend against criminal prosecution on the basis that they were engaged in customary trade for subsistence purposes, a subsistence use protected by ANILCA. *Id.* at 948. In deciding that customary trade was protected by ANILCA, the court cited ANILCA's definition of "subsistence uses"— "the customary and traditional uses by rural Alaska residents of wild renewable resources ... for barter, or sharing for personal or family consumption; *and for customary trade."* *Id.* at 946 (alteration in original).

The full text of ANILCA's definition of "subsistence uses" is:

[T]he customary and traditional *uses* by rural Alaska residents of wild, renewable resources for direct personal or family consumption as food, shelter, fuel, clothing, tools, or transportation; for the making and selling of handicraft articles out of nonedible byproducts of fish and wildlife resources taken for personal or family consumption; for barter, or sharing for personal or family consumption; and for customary trade.

ANILCA § 803, 16 U.S.C. § 3113 (emphasis added). This definition only covers various uses of subsistence resources. It does not cover traditional means and methods of hunting. And no other provision in ANILCA creates a general right to use traditional means and methods of taking game.

Title VIII of ANILCA does specifically protect the use of traditional means of surface transportation for subsistence hunting. Section 811(b) of Title VIII states, "Notwithstanding any other provision of this Act or other law, the Secretary shall permit on the public lands appropriate use for subsistence purposes of snowmobiles, motorboats, and other means of surface transportation traditionally employed for such purposes by local

---

**2.** In *State v. Morry,* 836 P.2d 358, 370 (Alaska 1992), we held that the Boards of Fish and Game "have the discretion, *but are not mandated,* to take into consideration the traditional and cus-

tomary methods of subsistence takings in their formulation of subsistence regulations." (Emphasis added.)

residents, subject to reasonable regulation." 16 U.S.C. § 3121(b). The protection of traditionally employed surface transportation methods implies that other traditional components of subsistence hunting or fishing, such as the use of certain guns, nets, or other equipment, are not exempt from state regulation.

Furthermore, numerous provisions in ANILCA require regulation of subsistence taking in accordance with sound wildlife management principles and the preservation of wildlife resources. *See* 16 U.S.C. §§ 3101(b), 3101(c), 3111(3), 3112(1), 3125(1). Restriction of traditional means and methods may be necessary to accomplish this goal. *See* ANILCA § 801(3), 16 U.S.C. § 3111(3) ("continuation of the opportunity for subsistence uses of resources on public and other lands in Alaska is threatened ... by taking of fish and wildlife in a manner inconsistent with recognized principles of fish and wildlife management").

In addition, no case law directly holds that ANILCA protects customary and traditional methods of hunting. There is a case, however, which could provide support for such a holding, *Native Village of Quinhagak v. United States,* 35 F.3d 388 (9th Cir.1994). In *Quinhagak,* the court ruled that several native villages were entitled to a preliminary injunction against the enforcement of an Alaska regulation barring the taking of rainbow trout for subsistence purposes. *Id.* at 395. The court held that the villages presented a showing of hardship sufficient to justify the preliminary injunction, since they demonstrated that rainbow trout was an important food source for them. *Id.* at 393. The court then added:

> The Villages also presented evidence that the federal and state regulations interfere with their way of life and cultural identity.... They needed to prove nothing more in light of the clear congressional directive to protect the cultural aspects of subsistence living. 16 U.S.C. § 3111(1) [ANILCA § 801(1) ] ("[T]he continuation of the opportunity for subsistence uses by rural residents of Alaska ... is *essential to*

> *Native* physical, economic, traditional, and *cultural existence....*").

*Id.* at 394 (alteration in original).

It might be inferred from this language that ANILCA protects traditional subsistence taking means and methods which are part of the cultural identity and way of life of Natives. However, *Quinhagak* only held that the villages were entitled to a preliminary injunction and did not resolve the merits of any controversy concerning the interpretation of ANILCA. Though an argument can be made based on *Quinhagak* that ANILCA does protect customary and traditional means and methods, we conclude that more weight should be accorded to Congress' failure to mention means and methods in ANILCA's definition of "subsistence uses" and to Congress' specific grant of protection to traditional means of surface transportation.

We hold that ANILCA does not protect the use of a spotlight as a customary and traditional method of subsistence hunting, and thus there is no actual conflict between ANILCA and Alaska law. Therefore, federal law does not preempt enforcement of Alaska's spotlighting ban against subsistence hunters on federal land, and the State does have jurisdiction over Totemoff.

## II. *JURISDICTION OVER NAVIGABLE WATERS*

■ Even if ANILCA does protect customary and traditional means and methods, thereby preempting state enforcement of the anti-spotlighting regulation against Totemoff on federal land, the State still has criminal jurisdiction if ANILCA does not apply to the navigable waters from which Totemoff shined his spotlight at the deer. Totemoff's conduct of taking a deer with the aid of an artificial light was committed partly in navigable waters and partly on federal land. If the elements of a crime are committed in different jurisdictions, "any state in which an essential part of the crime is committed" may assert jurisdiction. *State v. Scofield,* 7 Ariz.App. 307, 315, 438 P.2d 776, 784 (1968). "If an offense is committed partly on federal and partly on non-federal property, both sovereigns have jurisdiction." *State v. Kirksey,* 647 S.W.2d 799, 804 (Mo.1983) (en banc).

*See also Lane v. State,* 388 So.2d 1022, 1028 (Fla.1980) (though fatal blow struck in Alabama, Florida has jurisdiction over murder if either premeditation to murder or felony underlying murder occurred in Florida); *Commonwealth v. Lanoue,* 326 Mass. 559, 95 N.E.2d 925, 926 (1950) (if a criminal act is committed in two jurisdictions, a state has jurisdiction over the act if the part of the act committed within that state has been declared to be punishable by its laws); *State v. Kills on Top,* 243 Mont. 56, 793 P.2d 1273, 1285–86 (1990) (Montana has jurisdiction over felony-murder even though victim killed in Wyoming because underlying felony, kidnapping, occurred in Montana), *cert. denied,* 501 U.S. 1259, 111 S.Ct. 2910, 115 L.Ed.2d 1073 (1991); *People v. Fuller,* 185 A.D.2d 446, 586 N.Y.S.2d 366, 367–68 (App.) (New York has jurisdiction over rape defendant, even though actual sexual assault may have taken place in Pennsylvania, because element of forcible compulsion occurred in New York), *appeal denied,* 80 N.Y.2d 974, 591 N.Y.S.2d 144, 605 N.E.2d 880 (1992); *Brown v. Market Dev., Inc.,* 41 Ohio Misc. 57, 322 N.E.2d 367, 372 (Ohio C.P.1974) (Ohio would have jurisdiction over a person who stood in Ohio and fired a shot across the state border, killing someone in Indiana). *But see State v. Hall,* 114 N.C. 909, 19 S.E. 602, 604–05 (1894) (North Carolina did not have jurisdiction over defendant who while standing in North Carolina shot victim in Tennessee, since no North Carolina statute criminalized the conduct which occurred in North Carolina or otherwise conferred jurisdiction upon the state).

■ In this case, Totemoff's act of shining a spotlight and firing the fatal shot, an essential part of the crime with which he was charged, unlawful taking of game, occurred on navigable waters. Moreover, Alaska law specifically criminalizes conduct which Totemoff committed solely on navigable waters. Alaska Statute 16.05.940(33) defines "take" as "taking, pursuing, hunting, fishing, trapping, or in any manner disturbing, capturing, or killing or attempting to take, pursue, hunt, fish, trap, or in any manner capture or kill fish or game." Totemoff took actions in navigable waters which constitute "pursuing," "hunting," "disturbing," and "attempting to

take, pursue, hunt ... or in any manner capture or kill" deer. Therefore, the State has jurisdiction over Totemoff, even if ANILCA preempts the application of the spotlighting ban on federal land, so long as ANILCA does not give the federal government the power to regulate hunting and fishing in navigable waters.

■ ANILCA's subsistence priority applies only to "public lands." ANILCA § 804, 16 U.S.C. § 3114. Section 102 of ANILCA defines the term "public lands":

(1) The term "land" means lands, waters, and interests therein.

(2) The term "Federal land" means lands the title to which is in the United States after December 2, 1980.

(3) The term "public lands" means land situated in Alaska which, after December 2, 1980, are Federal lands, except—

(A) land selections of the State of Alaska which have been tentatively approved or validly selected under the Alaska Statehood Act and lands which have been confirmed to, validly selected by, or granted to the Territory of Alaska or the State under any other provision of Federal law.

16 U.S.C. § 3102. Thus, "public lands" means lands, waters, and interests therein, the title to which is in the United States. But "public lands" does not include lands, waters, and interests therein which were transferred to Alaska under other federal laws.

Whether "public lands" includes navigable waters was the subject of a recent Ninth Circuit decision, *Alaska v. Babbitt (Katie John),* 54 F.3d 549 (9th Cir.1995), *cert. denied* — U.S. —, 116 S.Ct. 272, — L.Ed.2d — (1995). The *Katie John* court considered whether ANILCA applies to navigable waters because of the federal government's navigational servitude or federal reserved water rights.

■ The navigational servitude is a dominant servitude, sometimes described as a "superior navigation easement," which allows the federal government to exercise its regu-

latory power over navigable waters in the interests of commerce without compensation for interference with private water rights. *United States v. Virginia Elec. & Power Co.,* 365 U.S. 624, 627–28, 81 S.Ct. 784, 787–88, 5 L.Ed.2d 838 (1961); *Boone v. United States,* 944 F.2d 1489, 1493–94 (9th Cir.1991). The servitude "is a concept of power, not of property." *United States v. Certain Parcels of Land Situated in Valdez,* 666 F.2d 1236, 1238 (9th Cir.1982). It is a "dominant right over navigable waters for purposes of improving and regulating navigation." *United States v. 119.67 Acres of Land, More or Less, Situated in Plaquemines Parish, La.,* 663 F.2d 1328, 1330 n. 5 (5th Cir.1981). The navigational servitude is derived from the Commerce Clause. *See United States v. Cherokee Nation of Oklahoma,* 480 U.S. 700, 704, 107 S.Ct. 1487, 1489–90, 94 L.Ed.2d 704 (1987); *Boone,* 944 F.2d at 1494 n. 9.

Under the reserved water rights doctrine, when Congress withdraws land from the public domain for a federal purpose, it implicitly reserves water necessary to accomplish the purposes of the reservation. *Cappaert v. United States,* 426 U.S. 128, 138, 96 S.Ct. 2062, 2069, 48 L.Ed.2d 523 (1976); *Colville Confederated Tribes v. Walton,* 647 F.2d 42, 46 (9th Cir.), *cert. denied,* 454 U.S. 1092, 102 S.Ct. 657, 70 L.Ed.2d 630 (1981). "The United States acquires a water right vesting on the date the reservation was created, and superior to the rights of subsequent appropriators." *Colville,* 647 F.2d at 46. The amount of water reserved under the doctrine is limited to what is necessary to fulfill the purpose of the land reservation. *Cappaert,* 426 U.S. at 141, 96 S.Ct. at 2070–71; *United States v. Adair,* 723 F.2d 1394, 1409 (9th Cir.1983), *cert. denied,* 467 U.S. 1252, 104 S.Ct. 3536, 82 L.Ed.2d 841 (1984).

A reservation of water may be implied only where the water is necessary for the primary purpose of the federal reservation, not where the water merely serves secondary purposes of the reservation. *United States v. New Mexico,* 438 U.S. 696, 702, 98 S.Ct. 3012, 3015, 57 L.Ed.2d 1052 (1978); *Adair,* 723 F.2d at 1408–09. In determining the scope of implied reserved water rights, a court may look only to the primary purpose

of a reservation at the time the land was first reserved by the federal government, and may not consider other purposes later given to the reservation. *See New Mexico,* 438 U.S. at 713–15. The reserved water rights doctrine has at times been treated as giving the government only a non-consumptive right to prevent others from using a supply of water in a manner that would deprive the federal reservation of the water necessary for its primary purpose; at other times, the doctrine has been interpreted as giving the United States the right to a specific amount of water. *Compare Cappaert,* 426 U.S. at 135, 143, 96 S.Ct. at 2068, 2071–72 *and Adair,* 723 F.2d at 1411 *with Arizona v. California,* 373 U.S. 546, 600–01, 83 S.Ct. 1468, 1497–98, 10 L.Ed.2d 542 (1963) *and Colville,* 647 F.2d at 47.

The Ninth Circuit in *Katie John* decided that the navigational servitude is not an interest to which the United States holds title and ruled that the navigational servitude does not convert all Alaska navigable waters to "public lands" as defined in ANILCA. 54 F.3d at 553. In doing so, the court reversed a federal district court decision which held that the navigational servitude is an interest to which the United States holds title for the purposes of ANILCA. *John v. United States,* Nos. A90–0484–CV, A92–0264–CV, 1994 WL 487830, at *17 (D.Alaska March 30, 1994). The Ninth Circuit also held in *Katie John* that reserved water rights are interests in land to which the federal government has title under ANILCA's definition of "public lands." 54 F.3d at 554.

We are not obliged to follow *Katie John,* since this court is not bound by decisions of federal courts other than the United States Supreme Court on questions of federal law. *In re F.P.,* 843 P.2d 1214, 1215 n. 1 (Alaska 1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2441, 124 L.Ed.2d 659 (1993). Though the State was a party to *Katie John,* it is not collaterally estopped here as to the issues decided in that case because the applicability of ANILCA to navigable waters is a pure question of law which does not involve factual issues. *See State v. United Cook Inlet Drift Ass'n,* 895 P.2d 947, 954 (Alaska 1995) ("the State is permitted to relitigate

unmixed questions of law so long as the subject matter of the second case is 'substantially unrelated' to that of the first"). We will follow *Katie John* only to the extent that its reasoning is persuasive.

■ For a number of reasons, we find that neither the navigational servitude nor reserved water rights bring navigable waters within ANILCA's definition of "public lands," and that the federal government has no authority based on the navigational servitude or the reserved water rights doctrine to regulate hunting and fishing in Alaska's navigable waters.

First, even if the navigational servitude or reserved water rights can be considered interests to which the United States holds title, the State has an interest in fish and wildlife located in navigable waters which precludes federal regulation of such fish and wildlife, under § 102(3)(A) of ANILCA and the Submerged Lands Act of 1953, 43 U.S.C. §§ 1301–56 (1988). Section 102(3)(A) of ANILCA exempts from the definition of "public lands" "lands which have been ... granted to the Territory of Alaska or the State under any other provision of Federal law." 16 U.S.C. § 3102(3)(A). As ANILCA § 102(1) defines "land" as "lands, waters, and interests therein," 16 U.S.C. § 3102(1), "public lands" does not include lands, waters, and interests therein granted to Alaska under another federal law.

A relevant interest in lands or waters is granted to Alaska by the Submerged Lands Act of 1953. Section 3(a) of the Act states:

It is hereby determined and declared to be in the public interest that (1) *title to and ownership of* the lands beneath navigable waters within the boundaries of the

respective States, and *the natural resources within such lands and waters, and (2) the right and power to manage, administer, lease, develop, and use the said* lands and *natural resources* all in accordance with applicable State law be, and they *are,* subject to the provisions hereof, *recognized, confirmed, established and vested in and assigned to the respective States* or the persons who were on June 5, 1950,[3] entitled thereto under the law of the respective States in which the land is located, and the respective grantees, lessees, or successors in interest thereof.

43 U.S.C. § 1311(a) (emphasis added). Section 2(e) of the Act states, "[t]he term 'natural resources' includes ... fish, shrimp, oysters, clams, crabs, lobsters, sponges, kelp, and other marine animal and plant life." 43 U.S.C. § 1301(e).

■ The Submerged Lands Act thus gives Alaska ownership of, title to, and management power over the following: lands beneath the navigable waters of Alaska,[4] the navigable waters themselves,[5] and fish and other marine life located in Alaska's navigable waters. Under § 102(3)(A) of ANILCA, the definition of "public lands" in ANILCA therefore excludes navigable waters.

■ Furthermore, § 6(a) of the Submerged Lands Act specifically precludes the navigational servitude from being used to give the federal government power over fish or animals in state navigable waters. The section states:

The United States retains all its *navigational servitude and rights in* and powers of regulation and control of said lands and *navigable waters* for the constitutional purposes of commerce, navigation, national

---

**3.** Under the Alaska Statehood Act, "[t]he Submerged Lands Act of 1953 [is] applicable to the State of Alaska and the said State [has] the same rights as do [other] States thereunder." Pub.L. No. 85–508, § 6(m) (1958), *reprinted in* 48 U.S.C. following § 5 (1988).

**4.** The term "lands beneath navigable waters" covers

all lands permanently or periodically covered by tidal waters up to but not above the line of mean high tide and seaward to a line three geographical miles distant from the coast line of each such State and to the boundary line of

each such State where in any case such boundary as it existed at the time such State became a member of the Union, or as heretofore approved by Congress, extends seaward (or into the Gulf of Mexico) beyond three geographical miles.

43 U.S.C. § 1301(a)(2).

**5.** The U.S. Supreme Court has referred to the Submerged Lands Act as a grant of "submerged lands and waters." *United States v. California,* 436 U.S. 32, 37, 98 S.Ct. 1662, 1665, 56 L.Ed.2d 94 (1978).

defense, and international affairs, all of which shall be paramount to, but *shall not be deemed to include, proprietary rights of ownership, or the rights of management, administration, leasing, use, and development of* the lands and *natural resources which are specifically* recognized, confirmed, established, and *vested in* and assigned to the respective *States* and others *by section [3]* of this [Act].

43 U.S.C. § 1314(a) (emphasis added). Under this statute, the navigational servitude and other federal rights in navigable waters cannot give the federal government ownership of navigable waters or management rights over fish and animals in navigable waters, as those rights are reserved to the states by § 3 of the Submerged Lands Act.

The second reason supporting our decision that ANILCA does not give the federal government power to regulate hunting and fishing in navigable waters is that the navigational servitude and reserved water rights are not the type of property interests to which title can be held. Authorities disagree on whether the term "title" applies only to fee ownership of property or also covers lesser possessory interests such as lease interests. *Dover Veterans Council, Inc. v. City of Dover,* 119 N.H. 738, 407 A.2d 1195, 1196 (1979); *see also United States v. Hunter,* 21 F. 615, 617 (C.C.E.D.Mo.1884); *compare United States v. City of New Brunswick,* 11 F.2d 476, 477 (3d Cir.1926) ("the ownership of title means ownership of property"), *rev'd on other grounds,* 276 U.S. 547, 48 S.Ct. 371, 72 L.Ed. 693 (1928) *and Schaible v. Fairbanks Medical & Surgical Clinic, Inc.,* 531 P.2d 1252, 1260 (Alaska 1975) (conventional definition of "title" is ownership of the premises) *with Shingleton v. State,* 260 N.C. 451, 133 S.E.2d 183, 189 (1963) ("title" signifies actual or constructive possession of property or the right to possession) *and East Norriton Medical Assocs., Ltd. v. Commonwealth,* 168 Pa.Cmwlth. 421, 650 A.2d 1169, 1171 (1994) (cites statute which defines "title" as a possessory or leasehold interest). However, it is generally accepted that "title" signifies at least some sort of possessory interest in property and does not include lesser interests such as easements. *See Kohl Indus. Park Co. v. County of Rockland,* 710 F.2d 895, 903 (2d Cir.1983).

■ Neither the navigational servitude nor reserved water rights are possessory interests in a body of water. The navigational servitude has been described as a "dominant servitude" and as a "superior navigation easement." *Virginia Elec. & Power,* 365 U.S. at 627, 81 S.Ct. at 787. Reserved water rights give the federal government the right to prevent others from appropriating water or to use a certain volume of water, not to possess a body of water. *See Cappaert,* 426 U.S. at 135, 143, 96 S.Ct. at 2068, 2071–72; *Arizona,* 373 U.S. at 600–01, 83 S.Ct. at 1497–98. Therefore, the United States cannot hold title to the navigational servitude or reserved water rights.

A similar conclusion was reached by a New York court when New York State claimed that it had title to submerged lands by virtue of state interests analogous to the federal navigational servitude and federal reserved water rights. In *Niagara Falls Power Co. v. Water Power & Control Commission,* 237 A.D. 216, 262 N.Y.S. 217, 219–221 (N.Y.App. 1932), *rev'd on other grounds,* 267 N.Y. 265, 196 N.E. 51 (N.Y.), *cert. denied,* 296 U.S. 609, 56 S.Ct. 128, 80 L.Ed. 432 (1935), an issue relevant to determining the amount of rent the state could charge for a water power site located on submerged lands which had been previously granted to a private company was whether "title" to the "water power sites or lands" was "vested in the state." The state argued that it had "title" through "[i]ts sovereignty and incidental control over navigable waters," a power similar to the federal navigational servitude, or through interference the power site could cause with state riparian rights appurtenant to a state park, an interest similar to federal reserved water rights. *Id.* at 221. The court rejected these arguments, explaining that these "inchoate and incorporeal" rights did not constitute "title." *Id.* at 224–25.

■ Our conclusion that the navigational servitude and reserved water rights are not interests to which the United States holds title may raise the question of what Congress intended when it included "interests" in "lands" or "waters," "the title to which is in

the United States," within ANILCA's definition of "public lands." *See* ANILCA §§ 102(1)–(3), 16 U.S.C. §§ 3102(1)–(3). A logical answer is that the word "interests" was intended to cover possessory interests lesser than fee interests such as leases, as there is considerable authority that title can be held to such interests. *See, e.g., Shingleton,* 133 S.E.2d at 189; *East Norriton,* 650 A.2d at 1171.

A broader reading would conflict with the clear statement doctrine, which is the third ground underlying our ruling on the navigable waters issue. The clear statement doctrine "counsels that a ... court should not apply a federal statute to an area of traditional state concern unless Congress has articulated its desire in clear and definite language to alter the delicate balance between state and federal power by application of the statute to that area." *H.J. Inc. v. Northwestern Bell Tel. Co.,* 954 F.2d 485, 495 n. 6 (8th Cir.) (quoting *Taffet v. Southern Co.,* 930 F.2d 847, 851 (11th Cir.1991), *vacated on other grounds and reh'g granted,* 958 F.2d 1514 (11th Cir.), *on reh'g en banc,* 967 F.2d 1483 (11th Cir.), *cert. denied,* — U.S. —, 113 S.Ct. 657, 121 L.Ed.2d 583 (1992)), *cert. denied,* 504 U.S. 957, 112 S.Ct. 2306, 119 L.Ed.2d 228 (1992). The doctrine means that "[i]f Congress intends to alter the 'usual constitutional balance between the States and the Federal Government,' it must make its intention to do so 'unmistakably clear in the language of the statute.' " *California State Bd. of Optometry v. Federal Trade Comm'n,* 910 F.2d 976, 981 (D.C.Cir.1990) (quoting *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 65, 109 S.Ct. 2304, 2309, 105 L.Ed.2d 45 (1989)); *see also BFP v. Resolution Trust Corp.,* — U.S. —, ———, 114 S.Ct. 1757, 1764–66, 128 L.Ed.2d 556 (1994). The doctrine applies "in circumstances in which the language of a statute or its legislative history provide some indication of ambiguity." *County of Suffolk v. Long Island Lighting Co.,* 907 F.2d 1295, 1306 (2d Cir.1990).

In this case, ANILCA's definition of "public lands" would have to be viewed as ambiguous before it could be interpreted as covering the navigational servitude or reserved water rights. Defining "public lands" as waters subject to the navigational servitude or reserved water rights would allow the federal government to regulate hunting and fishing in navigable waters. States have traditionally had the power to govern hunting and fishing in their navigable waters. Regulation of hunting and fishing is a traditional concern of the states. *See Coffee,* 556 P.2d at 1194; *Danielson,* 427 P.2d at 691. Congress has not expressed in unmistakably clear language a desire to alter this traditional allocation of state and federal power.

The fourth basis for our decision on this matter is that, even assuming the navigational servitude or reserved water rights are interests to which the United States holds title, the land management authority which the federal government obtains through these interests is limited by the purposes of the interests. The power any easement, servitude, or similar property interest gives to its holder is limited by the interest's purpose. *See, e.g., Southern Pac. Co. v. City of San Francisco,* 62 Cal.2d 50, 41 Cal.Rptr. 79, 396 P.2d 383, 386 (1964); *Benno v. Central Lake County Joint Action Water Agency,* 242 Ill. App.3d 306, 182 Ill.Dec. 522, 526, 609 N.E.2d 1056, 1060 (Ill.App.), *appeal denied,* 151 Ill.2d 561, 186 Ill.Dec. 378, 616 N.E.2d 331 (1993). For example, an easement giving a person the right to cross over another's property for access to his own land does not create a right to use the property subject to the easement for any other purpose.

Likewise, the navigational servitude only gives the United States the power to regulate navigable waters for navigation purposes without owing compensation, *Boone,* 944 F.2d at 1493–94; it does not permit federal regulation of hunting and fishing in navigable waters. Similarly, the reserved water rights doctrine only grants to the government the right to either exclude others from appropriating water which feeds a government reservation or to use a limited volume of water in order to serve the federal land reserved. *See Cappaert,* 426 U.S. at 135, 143, 96 S.Ct. at 2068, 2071–72; *Arizona,* 373 U.S. at 600–01, 83 S.Ct. at 1497–98. The doctrine does not provide the federal govern-

ment with plenary power over a body of water.

▮ Fifth, neither the navigational servitude power to regulate for navigation purposes nor the power to reserve water rights can grant the federal government jurisdiction to manage hunting and fishing in navigable waters. The two powers are over navigation and water, not fish and game.

The final reason for our ruling on the navigable waters issue concerns reserved water rights only. Employing the reserved water rights doctrine to define the geographic scope of navigable waters covered by ANILCA would be highly impractical, perhaps even impossible. It would first require the federal agencies administering ANILCA to determine the primary purpose of each federal land reservation in Alaska at the time the reservation was created. *See New Mexico,* 438 U.S. at 702, 713–15, 98 S.Ct. at 3015, 3020–22. Then, the federal agencies would have to ascertain the amount of water necessary to fulfill the primary purpose of the reservation. *See Cappaert,* 426 U.S. at 141, 96 S.Ct. at 2070. Afterwards, the agencies would have to somehow convert that amount of water into a surface area of water constituting "public lands" under ANILCA. This last step could be especially difficult, because reserved water rights represent the right to use a set volume of water or to prevent others from appropriating water, and not specific geographic areas around which property lines may be drawn. Congress could not have intended to create such a complicated and uncertain regulatory scheme.

Despite acknowledging that it was "impos[ing] an extraordinary administrative burden on federal agencies," the Ninth Circuit held in *Katie John* that reserved water rights are interests in land to which the federal government has title for ANILCA purposes. 54 F.3d at 554. The court's holding was based on two grounds. First, the court believed that the position taken by the federal agencies that reserved water rights do define the scope of ANILCA was a reasonable agency interpretation owed defer-

ence. *See id.* at 552–54. Second, the court feared undermining Congress' intent to protect subsistence fishing. *See id.* at 552, 554. In our view, neither of these considerations justifies the court's holding.

We apply federal law on deference in determining whether deference is owed to a federal agency's legal position. Under federal deference law, the *Katie John* court should not have deferred to the federal agencies' position on the meaning of ANILCA's definition of "public lands." *See id.* at 554. This position was first adopted by the federal government at oral argument before the district court. *Id.* at 552. Prior to that, the federal regulations promulgated pursuant to ANILCA and the explanations of those regulations had repeatedly generally excluded navigable waters from the definition of "public lands." *See* 36 C.F.R. § 242.3(b) (1994); 57 Fed.Reg. 22,940, 22,941 (1992); 56 Fed. Reg. 29,310, 29,311 (1991); 55 Fed.Reg. 27,-114, 27,115 (1990).[6]

▮ The federal government's new position that ANILCA covers navigable waters in which the United States has reserved water rights is a position taken during litigation, not a regulation or agency interpretation that is owed deference. The federal government's new position has not been formalized in any regulation. *See* 60 Fed.Reg. 31,542, 31,542–43 (1995). Positions on interpretations of statutes adopted by agencies during litigation which contradict earlier regulations are not owed deference by courts. *See Wolpaw v. Commissioner,* 47 F.3d 787, 790 (6th Cir.1995) (position announced by federal agency in the course of litigation owed no deference). If any interpretation is owed deference, it is the interpretation in the federal regulations that ANILCA generally does not apply to navigable waters, not the position adopted in a litigation context. *See id.* (while litigation position not owed deference, agency's earlier regulations may be entitled to some deference); *see also General Elec. Co. v. Gilbert,* 429 U.S. 125, 142–46, 97 S.Ct. 401, 411–13, 50 L.Ed.2d 343 (1976) (Court

---

6. Certain navigable waters over submerged lands to which the United States holds title were included in the definition of "public lands." *See*

36 C.F.R. 242.3(b); 57 Fed.Reg. 22,940, 22,941 (1992).

refuses to defer to agency interpretation contradicting previous, long-standing interpretation and follows earlier interpretation).

■ Deference is not due to the new federal position for several other reasons. The definition of "public lands" under ANILCA is a pure question of statutory construction. *See Immigration & Naturalization Serv. v. Cardoza–Fonseca,* 480 U.S. 421, 445–46, 107 S.Ct. 1207, 1220–21, 94 L.Ed.2d 434 (1987) (suggesting that no deference or lesser degree of deference is due to agency interpretation if issue before court is pure question of statutory construction). The issue involves no technical agency expertise. *See Thomas Jefferson Univ. v. Shalala,* —— U.S. ——, ——, 114 S.Ct. 2381, 2387, 129 L.Ed.2d 405 (1994) (deference more warranted when interpretation involves technical agency expertise). The federal agencies' position is not a long-standing one. *See Bowen v. American Hosp. Ass'n,* 476 U.S. 610, 646 n. 34, 106 S.Ct. 2101, 2122 n. 34, 90 L.Ed.2d 584 (1986) (if agency interpretation is neither consistent nor longstanding, the degree of deference it deserves is substantially diminished). Most importantly, the recent federal interpretation is not a reasonable, permissible construction of ANILCA, for the numerous reasons given earlier. *See National R.R. Passenger Corp. v. Boston & Me. Corp.,* 503 U.S. 407, 418, 112 S.Ct. 1394, 1402, 118 L.Ed.2d 52 (1992) ("a reviewing court need not accept an interpretation which is unreasonable"); *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984) (deference may be given to agency interpretation only if it is based on permissible construction of statute).

We also respectfully disagree with the conclusion of the court in *Katie John* that utilizing reserved water rights to define the scope of ANILCA is necessary to fulfill Congress' intent to protect subsistence fishing. The court noted that Congress intended ANILCA to protect subsistence uses, that subsistence uses include subsistence fishing, and that subsistence fishing has traditionally taken place in navigable waters. 54 F.3d at 552. The court then stated, "Thus, we have no doubt that Congress intended that public lands include at least some navigable waters." *Id.* The court later stated that ruling that neither the navigational servitude nor reserved water rights constitute interests to which the United States holds title for ANILCA purposes "would undermine congressional intent to protect and provide the opportunity for subsistence fishing." *Id.* at 554.

However, the definition of "public lands" in the federal regulations issued pursuant to ANILCA does include navigable waters over submerged lands owned by the United States. *See* 36 C.F.R. § 242.3(b); 57 Fed. Reg. 22,940, 22,941 (1992).[7] Moreover, some subsistence fishing takes place in non-navigable waters which are "public lands." *See, e.g., Quinhagak,* 35 F.3d at 391. Therefore, fulfilling Congress' intent to provide an opportunity for subsistence fishing does not require ruling that reserved water rights define "public lands" under ANILCA.

■ Because the Submerged Lands Act of 1953 specifically gives states authority over fish and animals in navigable waters and precludes the navigational servitude or reserved water rights from being used to erode that authority, because the navigational servitude and reserved water rights are not interests to which title can be held, because of the clear statement doctrine, because the navigational servitude and reserved water rights are limited interests which do not give the federal government power over navigable or reserved waters unrelated to those interests, and for the other reasons discussed above, we hold that navigable waters are generally not "public lands" under ANILCA. Therefore, ANILCA does not curtail the State's authority to regulate hunting and fishing in navigable waters, and the State has criminal jurisdiction over Totemoff.

---

7. The area encompassed in the regulation defining ANILCA's scope is substantial. It includes, to name only the largest areas, the Arctic Ocean watershed from the Canadian border to Cape Lisbourne on the Chukchi Sea, and virtually all of the Aleutian Islands. *See* 36 C.F.R. § 242.3(b)(1), (4).

## III.  *VALIDITY OF REGULATION*

As the State has the right to prosecute Totemoff, we proceed to consider his state law defense.  Totemoff argues that the regulation prohibiting spotlighting is invalid because the Board of Game failed to consider the impact of the regulation on subsistence hunting at its adoption.  Both the district court and the court of appeals held that *State v. Eluska,* 724 P.2d 514 (Alaska 1986), prohibited Totemoff from challenging the regulation in a criminal proceeding.  *See Totemoff,* 866 P.2d at 129.  In addition, the State argues that AS 16.05.259, a statute entitled "No Subsistence Defense," prevents Totemoff from challenging the regulation.

### A.  *Eluska*

Both lower courts misinterpreted *Eluska.* In that case, Eluska, the defendant, killed a deer out of season.  There were no subsistence regulations separate from the general hunting regulations.  Eluska defended against prosecution on the grounds that he was hunting for subsistence purposes, that the Board had violated its statutory duty to adopt subsistence regulations, and that therefore his actions were lawful.  724 P.2d at 514.  The court of appeals accepted his defense.  The court held that Alaska law gave subsistence users a right to hunt for subsistence purposes.  The court ruled that in areas where the Board of Game failed to adopt regulations permitting subsistence hunting, a person charged with violating hunting laws could defend on the basis that he was hunting for subsistence.  *Id.* at 515.

We reversed, citing AS 16.05.920(a), which prohibits taking any game unless permitted by statute or regulation.  We observed that no Alaska statute or constitutional provision gave persons the right to hunt for subsistence in the absence of regulations authorizing such hunting, and noted that the decision of the court of appeals would have permitted unregulated hunting in areas where the Board failed to adopt regulations authorizing subsistence hunting.  *Id.* We cited one of our earlier decisions, *United States Smelting, Refining & Mining Co. v. Local Boundary Commission,* 489 P.2d 140 (Alaska 1971), ex-plaining that the case held that "agency action taken without first complying with a statutory requirement may be invalid," not that "an agency's failure to act in accordance with a statutory requirement means that those who are regulated by the agency may act as though they were not regulated." *Eluska,* 724 P.2d at 516.

*Eluska* only held that a person may not hunt for subsistence purposes without regulations authorizing the person to do so.  It did not rule that a subsistence hunter may not defend against criminal prosecution on the grounds that the regulation the hunter is charged with violating is procedurally invalid.  Unlike the defendant in *Eluska,* Totemoff disputes the validity of a specific regulation.  Therefore, we hold that *Eluska* does not bar Totemoff's defense.

### B.  *Alaska Statute 16.05.259*

After the court of appeals' decision in *Eluska* was announced, but before we published our decision in the case, the legislature adopted AS 16.05.259.  *See Bobby v. Alaska,* 718 F.Supp. 764, 785 (D.Alaska 1989).  Alaska Statute 16.05.259 states, "In a prosecution for the taking of fish or game in violation of a statute or regulation, it is not a defense that the taking was done for subsistence uses."

Arguing that AS 16.05.259 prohibits Totemoff from challenging the spotlighting ban, the State relies on a passage from a Senate Committee on Resources report on the legislation which contained AS 16.05.259.  In its entirety, that passage reads:

> [Alaska Statute 16.05.259] states that in a prosecution for the taking of fish or game in violation of a statute or regulation, it is not a defense to the charge that the taking was done for subsistence use.  *This section requires a person who disagrees with a board action or statute to seek to correct that action or statute through appeal, petitions for reconsideration, court action, etc. rather than permitting the person to violate the statute or regulation and claim subsistence as a defense.  This elim-*

inates the "subsistence defense" as arose in the *Eluska* and *Skuse*[8] cases.

This section does not effect [sic] AS 16.05.930(b) which allows people to take fish and game in case of emergency. *This section .is also not intended to limit a persons [sic] ability to challenge a regulation that is unreasonable in its terms or fails to provide a reasonable opportunity to satisfy subsistence uses as required in proposed AS 16.05.258(c).* An example might be a hunting season on caribou that was open in a particular area before or after the caribou migrated through the area, but was closed while the caribou were in the area. Such a regulation would be unreasonable on its face and would fail to provide a reasonable opportunity for subsistence uses as required by AS 16.05.258(c).

Senate Committee on Resources, *RE: SCS for CS for HB 288 (Resources) "An Act relating to the taking of fish and game for subsistence and personal use; and providing for an effective date"* 8–9 (March 12, 1986) (emphasis added). The report shows that AS 16.05.259 was designed to undo the court of appeals' decision in *Eluska.*

However, the report is also somewhat contradictory. It first states that the law requires a person who disagrees with a Board action to seek to correct that action through administrative means, not a challenge in a criminal prosecution. It then states that it does not prohibit a person from contesting a regulation in a criminal proceeding on the basis that the regulation is unreasonable or fails to provide a reasonable opportunity to satisfy subsistence uses.

■ These contradictory passages suggest that under AS 16.05.259 a subsistence hunter may challenge a regulation in a criminal case only on the grounds that the regulation is unreasonable or fails to provide an opportunity to satisfy subsistence needs, but not on other grounds. But such a reading cannot be justified by the plain language of the statute. Legislative history may not be

used to legislate detailed rules that cannot be supported by a statute's explicit language. *Cf. Madison Galleries, Ltd. v. United States,* 870 F.2d 627, 629–30 (Fed.Cir.1989).

As the committee's report is not particularly helpful, we look to AS 16.05.259's language and to the fact that it was passed to undo the court of appeals' decision in *Eluska* in order to divine the statute's meaning. The plain language of AS 16.05.259 does not bar challenges to the validity of a regulation such as 5 AAC 92.080(7), which governs means or methods of subsistence hunting. The law simply states, "In a prosecution for · the taking of fish or game in violation of a statute or regulation, it is not a defense that the taking was done for subsistence uses." This only means, as we held in *Eluska,* that unauthorized hunting does not become lawful because it is subsistence hunting. The statute does not state that a subsistence hunter may not challenge the validity of a means or methods regulation under which the hunter is prosecuted.

■ Furthermore, deciding that a subsistence hunter may contest the validity of a regulation under which the hunter is prosecuted is consistent with a recent decision of ours, *State v. Palmer,* 882 P.2d 386 (Alaska 1994). The defendant in *Palmer* was charged with violating the bag limit in a regulation governing subsistence hunting of caribou. *Id.* at 386. We held that while part of the regulation may have been invalid, the defendant could be prosecuted because the potentially invalid portion of the regulation was severable from the portion of the regulation containing the bag limit. *Id.* at 389. No suggestion was made in *Palmer* that *Eluska* or AS 16.05.259 prohibited the defendant, a subsistence hunter, from challenging the regulation under which he was charged.

■ Since *Eluska* and AS 16.05.259 were intended only to prevent hunters who took game in the absence of any regulation authorizing them to do so from claiming a subsistence defense, we hold that neither *Eluska*

---

8. *State v. Skuse,* No. 3KNS–85–1111 Cr. (Alaska Dist.Ct., January 17, 1986), was a district court decision similar to the court of appeals' decision in *Eluska.* In *Skuse,* the defendant was fishing for subsistence in an area where no regulation permitted subsistence fishing. Slip op. at 6. The court accepted the defendant's subsistence defense and granted his motion for prejudgment acquittal. *Id.* at 7.

nor AS 16.05.259 prohibit Totemoff from contesting the validity of the spotlighting ban.

## C. *Board's Failure to Consider Impact on Subsistence*

We now reach the merits of Totemoff's challenge to the regulation. Totemoff argues that the regulation banning taking of game with the aid of an artificial light is not valid because the Board did not consider whether the regulation was appropriate for subsistence hunting when it was adopted. Totemoff's argument is based on former AS 16.05.258(c), which stated in relevant part: "The boards shall adopt ... subsistence hunting regulations for each ... population for which a harvestable portion is determined to exist [consistent with sustained yield]." Under former AS 16.05.258(f), subsistence takings were "subject to reasonable regulation of seasons, catch or bag limits, and methods and means." In addition, AS 16.05.255 provides in relevant part:

(a) The Board of Game may adopt regulations it considers advisable in accordance with AS 44.62 (Administrative Procedure Act) for

. . . . .

(3) establishing the means and methods employed in the pursuit, capture, and transport of game ...;

. . . .

(10) regulating sport hunting and subsistence hunting as needed for the conservation, development, and utilization of game.

As noted, the challenged regulation, 5 AAC 92.080(7), prohibits the taking of game with the use of an artificial light.[9] This prohibition applies statewide to both subsistence and general hunting. 5 AAC 92.001 states: "Except as specifically provided otherwise, the regulations in this chapter apply statewide to subsistence hunting, general hunting, and trapping, as applicable."

Totemoff argues that the artificial light regulation is invalid because the Board of Game did not hold a hearing to determine whether the regulation was suitable for application to subsistence hunting. He argues that our decision in *State v. Morry*, 836 P.2d 358 (Alaska 1992), holds that the Board of Game must conduct "consistency hearings" to determine the suitability of means and methods prohibitions to subsistence hunting. The State, by contrast, argues that the regulation is presumed to have been validly enacted and nothing in the record rebuts this presumption. For the reasons that follow,

---

9. 5 AAC 92.080 provides:
The following methods of taking game are prohibited:
(1) by shooting from, on, or across a highway;
(2) with the use of any poison, except with the written consent of the board;
(3) knowingly, or with reason to know, with the use of a helicopter in any manner, including transportation to, or from, the field of any unprocessed game or parts of game, any hunter or hunting gear, or any equipment used in the pursuit or retrieval of game; this paragraph does not apply to transportation of a hunter, hunting gear, or game during an emergency rescue operation in a life-threatening situation;
(4) unless otherwise provided in this chapter, from a mechanical vehicle, or from a motor-driven boat or snowmachine unless the motor has been completely shut off and the progress from the motor's power has ceased, except that a motor-driven boat may be used to take caribou in Units 23 and 26, a snowmachine may be used to take caribou in Unit 23, and a motorized vehicle may be used to take game as described in (10) of this section;

(5) with the use of an aircraft, snowmachine, motor-driven boat, or other motorized vehicle for the purpose of driving, herding, or molesting game;
(6) with the use or aid of a machine gun, set gun, or a shotgun larger than 10 gauge;
(7) with the aid of a pit, fire, artificial light, radio communication, artificial salt lick, explosive, barbed arrow, bomb, smoke, chemical, or a conventional steel trap with a jaw spread over nine inches; however, the "conibear" style trap with a jaw spread of less than 11 inches may be used;
(8) with a snare, except for taking an unclassified game animal, a furbearer, grouse, hare, or ptarmigan;
(10) from a motorized land vehicle; except that in those portions of Units 7 and 15 within the Kenai National Wildlife Refuge, a motorized land vehicle may be used to take game by a person with physical disabilities, as defined in AS 16.05.940, who requires a wheelchair for mobility, under authority of a permit issued by the department and in compliance with Kenai National Wildlife Refuge regulations.

we accept the State's argument and reject Totemoff's.

The procedures for adopting regulations are set forth in the Administrative Procedure Act (APA) at AS 44.62.180–.290. The APA requires that notice of the proposed adoption of a regulation be published and disseminated thirty days before adoption. AS 44.62.190. The notice must contain an informative summary. AS 44.62.200(3). On the date designated in the notice the agency must give each interested person "the opportunity to present statements, arguments, or contentions in writing, with or without opportunity to present them orally." AS 44.62.210(a).

Alaska Statute 44.62.100 provides that upon the filing of a certified copy of a regulation, rebuttable presumptions are created that "(1) it was duly adopted; (2) it was duly filed and made available for public inspection at the day and hour endorsed on it; [and] (3) all requirements of this chapter and the regulations relative to the regulation have been complied with."

■■ Totemoff implies that our decision in *Morry* requires a hearing in addition to that called for in AS 44.62.210(a). We do not read that case so broadly. At issue in *Morry* were regulations applicable to brown bear hunting which required hunters, among other things, to purchase a numbered, nontransferable tag before hunting and to affix and keep the tag on the animal after it was killed, and sealing requirements mandating that the successful hunter keep the skin and skull of a bear and have a state official seal these parts. 836 P.2d at 360. By contrast, the regulations did not prohibit letting the bear meat rot in the field. *See id.* at 363.

The superior court in *Morry* invalidated these regulations. *Id.* at 361. On appeal we affirmed on two grounds. First, we accepted the appellees' argument that the regulations in question were trophy-hunting regulations not appropriate as subsistence hunting regulations and that the regulations thus violated former AS 16.05.258(c), which required the Board to adopt subsistence hunting regulations. *Id.* at 363–64. We stated concerning this point:

In particular, we find compelling the following arguments which were advanced by Morry and Kwethluk:

> [w]hatever the 'noncommercial, customary and traditional uses' standard of the definition of 'subsistence uses' in AS 16.05.940(30) may mean, it is plainly related to non-trophy uses that are 'for direct personal or family consumption as food, shelter, fuel, clothing, tools or transportation,' for the 'making and selling' of handicrafts, and for 'customary trade, barter or sharing.' There is no hint that hunting for trophies is a subsistence use. . . .
>
> Many people, both residents of the state and non-residents, hunt grizzly bears for trophies and leave the meat at the kill site . . . But it is not a subsistence use, and plaintiffs have contended throughout that it is manifestly unreasonable to apply the regulatory regime designed to govern such trophy-hunting practices to the uses in those places, such as Kwethluk and Anaktuvuk Pass, where brown bears are hunted for the meat and raw materials.

*Id.* (alteration in original).

As an alternative reason for affirmance, we held that the regulations were adopted by the Board in violation of the Administrative Procedure Act. *Id.* at 364. The appellees had argued that there never was an "APA rulemaking hearing, which would have provided a record demonstrating careful consideration of the applicable subsistence laws." *Id.* at 363. The State did not directly address this contention and thus made no effort to refute it. *Id.* We accepted it as a fact that "no hearing was ever held." *Id.* at 364.

Our conclusion in *Morry* that the regulations were invalid "on the ground that [they] were adopted by the board in violation of the [APA]," *id.* at 364, contradicts Totemoff's implied assertion that *Morry* imposes special hearing requirements beyond those called for by the APA. We do not so read *Morry*.

"[O]ne challenging an administrative regulation 'must show . . . a substantial failure [to comply with the APA] in order to rebut the presumption of procedural validity.'" *Gil-*

*bert v. State, Dep't of Fish & Game, Bd. of Fisheries*, 803 P.2d 391, 394 (Alaska 1990) (alteration in original) (citing *Chevron U.S.A. Inc. v. LeResche*, 663 P.2d 923, 929 (Alaska 1983)). Totemoff has not offered any evidence that 5 AAC 92.080(7), the anti-spotlighting regulation, or 5 AAC 92.001, which applied the anti-spotlighting regulation to subsistence hunting, were invalidly adopted.[10]

■ However, because the district court ruled that Totemoff's challenge was barred by *Eluska*, the district court was unable to inform Totemoff that he had not presented the kind of evidence necessary for an informed ruling on the validity of the regulation, and to give Totemoff an opportunity to remedy the deficiency in his pre-trial motion challenging the regulation. As a result, it would be unfair to rule on Totemoff's attack on the regulation without giving Totemoff an opportunity to introduce evidence that the procedures mandated by AS 44.62.180–.290 were not followed when 5 AAC 92.001 or 5 AAC 92.080(7) were adopted. *See Union Oil Co. of California v. State, Dep't of Natural Resources*, 574 P.2d 1266, 1272 (Alaska 1978) (challenger to regulations given opportunity to present additional evidence on remand, where challenger had not had sufficient reason to introduce evidence relevant to attack on regulations in original proceedings below because of procedural history of case).

The appropriate remedy is thus a remand to the district court. If Totemoff demonstrates on remand that 5 AAC 92.001 or 5 AAC 92.080(7) were adopted without Board compliance with AS 44.62.180–.290, the district court should vacate Totemoff's conviction and dismiss the charges against him. If Totemoff fails to make the requisite showing, the district court should allow his conviction to stand.

## IV. CONCLUSION

We hold that the State has jurisdiction over Totemoff because it has the power to enforce its hunting and fishing laws against subsistence users on federal land, so long as those laws do not conflict with federal laws or regulations. There is no such conflict in this case, since there is no federal right to employ customary means and methods of taking. We further hold that the State has jurisdiction over Totemoff because he violated Alaska law in navigable waters above state lands and ANILCA does not give the federal government the power to regulate subsistence hunting and fishing in such navigable waters.

We REVERSE the decision of the court of appeals that *Eluska* bars Totemoff from challenging the spotlighting regulation. Alaska Statute 16.05.259 also does not stop Totemoff from contesting the regulation. We hold that the regulation is invalid under *Morry* only if the Board failed to comply with the requirements of AS 44.62.180–.290. *Morry* does not impose a substantive hearing requirement on the Board not contained in the APA.

We REMAND this case to the district court for development of the record relevant to Totemoff's procedural challenge to the spotlighting ban. If Totemoff demonstrates that the Board did not comply with the requirements of AS 44.62.180–.290 when it passed 5 AAC 92.001 or 5 AAC 92.080(7), the district court should vacate Totemoff's conviction and dismiss the charges against him. Otherwise, the conviction is to stand.

**10.** As noted, the regulations challenged in *Morry* dealt not with the means of pursuit or capture of game, but with the handling of animal parts considered trophies. The artificial light regulation does not suffer from the substantive defect of the *Morry* regulations in that it is not a trophy-hunting regulation which is "manifestly unreasonable" in its application to subsistence hunting. *See id.* at 363. Reasonable grounds for applying the spotlighting ban to subsistence hunting include safety concerns associated with shots fired at night, preventing the wrong species from being taken, and making enforcement of bag limits easier.