**Scott P. ROBART, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. A–8313.**

Court of Appeals of Alaska.

Jan. 23, 2004.

---

**3.** *Ivanoff v. State,* 9 P.3d 294, 300 (Alaska App. 2000).

**4.** *Ivanoff,* 9 P.3d at 300.

Matthew W. Claman, Claman Law Firm, Anchorage, for Appellant.

Douglas Kossler and Kenneth M. Rosenstein, Assistant Attorneys General, Office of Special Prosecutions and Appeals, Anchorage, and Gregg D. Renkes, Juneau, Attorney General, for Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

*OPINION*

STEWART, Judge.

A jury found Scott P. Robart guilty of using the state seal for an advertising or commercial purpose without the written permission of the lieutenant governor.[1] On appeal, Robart claims that the statute protecting the state seal, AS 44.09.015, is preempted by federal copyright law. Robart also claims that the district court erred when it refused to issue a protective order to prevent the State from arguing that the state government was unaware of Robart's use of the state seal, that the jury was not instructed on Robart's theory of the "mistake of fact" defense, and that the general verdict form used

---

1. AS 44.09.015(a) & (b).

did not ensure that the jury deliberated on all the elements of his defense. For the reasons expressed below, we find that federal copyright law does not preempt AS 44.09.015, that no error occurred when the district court refused to issue the protective order, that the jury was properly instructed on the mistake of fact defense, and that the general verdict form was adequate. Accordingly, we affirm Robart's conviction.

### Facts and proceedings

This case began in 1996, when an employee of the State Department of Commerce and Economic Development wrote Robart and "invited him to submit 'one or more of your company's products' for consideration for a show featuring consumer products from Alaska[.]"[2] The show was to appear on QVC, a home-shopping television cable channel. Robart decided to participate.[3] He wanted to use the state seal on a medallion commemorating the anniversary of the Alaska gold rush.

At trial, Robart testified that he did some research regarding use of the state seal, and found the statute that required him to get permission from the lieutenant governor. He called the lieutenant governor's office and was told to put his request in writing; he did so, faxing his request soon after he had called. He got no response. Although he re-faxed his request, and made another phone call, he still received no response. Consequently, he testified that he thought the lieutenant governor's office did not think that the state seal was important, and that the office would not enforce the statute. But he then called the governor's office, and submitted to that office the faxes he had sent to the lieutenant governor. He received no answer from the governor's office either.

Because he had been encouraged by the Department of Economic Development to submit a product, he decided to proceed and to use the state seal on a medallion without permission. Robart submitted a form showing the design of his medallion, which had a reproduction of the state seal on one side. He testified that no one from the state said anything about his not having permission. Nor did anyone tell him not to proceed until he had the permission of the lieutenant governor. Robart said that because no one said anything to him, he thought that his using the medallion without permission was not an issue for anyone in the government.

On February 1 and 2, 1997, various vendors, including Robart, displayed Alaska-made products at a trade show in Anchorage. Robart's medallion was one of those chosen to be sold on QVC. On April 17, 1997, the governor sent Robart a letter, congratulating him on his company's "selection as one of Alaska's top small businesses, and for earning the opportunity to present your product during the upcoming QVC live national broadcast."

On May 24, 1997, Robart appeared on QVC marketing a silver and gold medallion commemorating the anniversary of the 1897 Alaska gold rush.[4] A replica of the state seal was on one side of this medallion, while a design for the Gold Rush Centennial was on the other side.[5] John Lindback, then the lieutenant governor's chief of staff, watched the QVC show; when he saw Robart's medallion, he wondered if Robart had permission to use the state seal. Because Robart did not have permission, Lieutenant Governor Fran Ulmer, on May 29, 1997, sent him a letter, with a copy of AS 44.09.015, explaining that it had been her policy since taking office "that the state seal shall not be used for commercial purposes."[6] She told him to stop selling the medallions because he was violating AS 44.09.015.[7] Robart acknowledged receiving this letter.[8] He responded with a letter that same day. Although he claimed that he was "confused" by the lieutenant governor's position, he did not admit

2. *State v. Robart*, 988 P.2d 1114, 1114 (Alaska App.1999).

3. *Id.*

4. *Id.*

5. *Id.*

6. *Id.*

7. *Id.*

8. *Id.*

that he had known that he needed permission, nor did he claim that he thought he had any authorization to use the state seal.

On August 6, 1997, two months after Robart had been told to stop selling his medallions, Alaska State Trooper Curt Harris, posing as a buyer, purchased two of the medallions from Robart.[9] On August 12, 1997, shortly after this purchase, another trooper interviewed Robart. Robart told this trooper that he did not know that he needed permission to use the state seal.

The State charged Robart with using the state seal for commercial purposes without the written permission of the lieutenant governor.[10] Robart moved for dismissal on the grounds that the statute violated his federal and state constitutional rights to free speech. The district court agreed, concluding that "the state statute violated Robart's constitutional right to freedom of speech and expression."[11] The State appealed.

On appeal, after finding that the State had a legitimate governmental interest in regulating the commercial use of the state seal, we concluded that commercial use of the state seal was not protected speech.[12] After we reversed the district court's dismissal, Robart successfully petitioned the supreme court for a hearing. When granting the petition for hearing, the supreme court ordered the parties to brief whether federal copyright law preempted AS 44.09.015. After briefing and oral argument, however, the supreme court dismissed the petition as improvidently granted.

The case then returned to the district court. There, Robart moved to dismiss the charge, arguing that federal copyright law preempted AS 44.09.015. Robart relied on the briefings that he and the State had submitted to the supreme court. Robart also submitted the transcript of the oral argument before the supreme court. Ultimately, District Court Judge John Lohff denied Robart's motion.

At trial, Robart claimed that his defense was a "mistake of fact" regarding whether he had gotten permission to use the seal. But at trial, Robart wanted the jury instructed that the governor (rather than the lieutenant governor) could and did give Robart written permission to use the state seal. To that end, Robart unsuccessfully sought a number of jury instructions that addressed various principles from agency law (agents and principals, and imputed knowledge), and the powers and duties of the governor. Most of these requests for instructions were denied, although the district court did agree to instruct the jury that the executive power of the state is vested in the governor, and that his office included the lieutenant governor and the governor's staff. In addition, the district court modified some of Robart's other proposed instructions. Robart also unsuccessfully sought both a protective order to prevent the State from claiming that state employees were unaware that he was using the state seal on his medallion after February 1997, and an elaborate special verdict form. A jury found Robart guilty of violating AS 44.09.015. This appeal followed.

*Does federal copyright law preempt AS 44.09.015?*

Robart claims that federal copyright law preempts AS 44.09.015(a), which provides that a person "may not use or make a die or impression of the state seal for any advertising or commercial purpose, unless written permission has first been obtained from the lieutenant governor."[13]

Federal copyright law is found at 17 U.S.C. §§ 100–1332 (2000). Among other things, it provides in part that "all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright ... are governed exclusively by this title." 17 U.S.C. § 301(a). Section 301(a), however, is qualified by subsection

---

9. *Id.*

10. *Id.*

11. *Id.* at 1115.

12. *Id.*

13. Under AS 44.09.015(b), "[v]iolation of this section is a misdemeanor, and upon conviction is punishable by a fine of not more than $500, or by imprisonment for not more than six months, or by both."

(b), which provides that "[n]othing in this title annuls or limits any rights or remedies under the common law or statutes of any State with respect to" certain types of matters or actions. The first of these exceptions is "subject matter that does not come within the subject matter of copyright as specified by sections 102 and 103 [of Title 17]." [14] The second exception does not apply in this case. The third exception addresses "activities violating legal or equitable rights that are not equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 [of Title 17]." [15]

Robart's position is that the state seal can only be protected by the federal copyright statute. Based on copyright law, he argues that the state seal is now in the public domain and can be used freely by the public. He concludes that the state cannot pass its own statute to provide protections similar to those in the copyright statute.

The State's position is that AS 44.09.015 is not preempted, because it falls within the preemption exceptions listed in 17 U.S.C. § 301(b). The State argues that AS 44.09.015 falls within § 301(b)(1) and (b)(3).

Under § 301(b)(1), federal copyright law does not preempt state law that addresses rights or remedies that do not come within the subject matter of copyright as set out in §§ 102 or 103. Meanwhile, under § 301(b)(3), federal copyright law does not preempt state law that addresses rights or remedies "with respect to ... activities violating legal or equitable rights that are not equivalent to any of the exclusive rights within the general scope of copyright[.]" The State argues that a state seal, because it is the symbol of a sovereign, is not a type of work that comes within the subject matter of copyright.

We agree with the State—copyright law does not preempt the Alaska statute limiting the commercial use of the state seal. We believe it is clear that states have the power to protect symbols of their sovereignty. [16] For instance, the Supreme Judicial Court of Massachusetts in *Commonwealth v. R.I. Sherman Manufacturing Co.*, held that the commonwealth could prevent the use of its seal for advertising or commercial purposes. [17] Convicted of violating a statute that prohibited the use of " 'the great seal of the

---

**14.** Section 102(a) provides that "[c]opyright protection subsists, in accordance with this title, in original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device." This section then provides a list of categories of works of authorship:

(1) literary works;
(2) musical works, including any accompanying words;
(3) dramatic works, including any accompanying music;
(4) pantomimes and choreographic works;
(5) pictorial, graphic, and sculptural works;
(6) motion pictures and other audiovisual works;
(7) sound recordings; and
(8) architectural works.

Section 102(b) provides that "[i]n no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work."

Section 103 applies to compilations and derivative works of the items listed in § 102, and is not applicable in this case.

**15.** Section 106 provides that

[S]ubject to sections 107 through 121 [none of which apply in this case], the owner of copyright under this title has the exclusive rights to do and to authorize any of the following:

(1) to reproduce the copyrighted work in copies or phonorecords;
(2) to prepare derivative works based upon the copyrighted work;
(3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;
(4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly;
(5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly; and
(6) in the case of sound recordings, to perform the copyrighted work publicly by means of a digital audio transmission.

**16.** The state seal is provided for in article XV, § 21, of the Alaska Constitution.

**17.** 189 Mass. 76, 75 N.E. 71, 72 (1905).

commonwealth, [or] any representation thereof, for any advertising or commercial purpose whatever,' " [18] the defendant argued that the commonwealth had interfered both with the defendant's trademark and with the commerce clause of the U.S. Constitution. Finding that the commonwealth had appropriated its great seal "to itself as a symbol of its sovereignty," [19] the court said that "[a]s against the commonwealth, the defendant cannot have any claim to a trademark." [20] The fact that the commonwealth could protect its seal was to the court "too clear for argument." [21] The court also found that because the statute "merely . . . protect[ed] the seal and coat of arms of the commonwealth," it did not conflict with the commerce clause.[22]

Likewise, the federal Court of Appeals for the District of Columbia in *In re Cahn, Belt, & Co.*[23] recognized that as against a state, no person or entity can "acquire [an exclusive use] property right in the [state's] coat of arms . . . or any simulation thereof[.]" [24]

In addition, in *Katz v. Department of Motor Vehicles*,[25] the California Court of Appeals ruled that the state had "the right to protect the legitimacy, credibility and reliability of its symbols and emblems because of the substantial impact the symbols may have on public attitudes and behavior." [26] Katz had challenged the constitutionality of the state's power to prevent certain combinations of numbers, letters or both from appearing on personalized license plates.[27]

▮ Before Congress can be said to have preempted an area that has traditionally been occupied by the states, "congressional intent to supersede state laws must be 'clear and manifest.' " [28] Here, federal copyright law is silent on this issue—state seals are not mentioned at all. Additionally, we cannot find a single federal or state case discussing the application of federal copyright law on laws protecting state seals. Nor have we—or the parties—found any other evidence that Congress intended to preempt the states' ability to protect and regulate their state seals.

Moreover, state seals appear to be more akin to trademarks or service marks than they are to the type of work Congress intended copyrights to cover. The federal trademark statute—unlike the copyright statute—specifically provides for state flags, coats of arms, or other insignia by prohibiting them from being registered. *See* 15 U.S.C. § 1052 (2000). Additionally, the majority of cases addressing state seals are trademark cases; [29] there are no copyright cases addressing this issue.

▮ Although we recognize that trademark and copyright law can overlap,[30] generally speaking, the two schemes address different concerns. Under the copyright statute, an author secures "the sole right to copy the protected work and to license others to produce copies." [31] The copyright holder may not only "exploit his work commercially, [but] may also exercise the copyright in a purely proscriptive manner to prevent anyone from copying the protected work." [32] Trademarks, however, are based on common law concepts of unfair competi-

---

18. *Id.* at 71.

19. *Id.*

20. *Id.* at 72.

21. *Id.*

22. *Id.*

23. 27 App. D.C. 173 (1906).

24. *Id.* at 178–79.

25. 32 Cal.App.3d 679, 108 Cal.Rptr. 424 (1973).

26. *Id.* at 428.

27. *Id.* at 425.

28. *Totemoff v. State*, 905 P.2d 954, 958 (Alaska 1995) (citations omitted).

29. *See R.I. Sherman Mfg. Co.*, 75 N.E. at 71; *In re Cahn, Belt, & Co.*, 27 App. D.C. at 173.

30. *See, e.g., Bicentennial Comm'n. v. Olde Bradford Co.*, 26 Pa.Cmwlth. 636, 365 A.2d 172, 176 (1976) ("Although the laws governing copyrights and trademarks may overlap as applied to a single item, they are intended to grant quite different forms of protection to their holders.").

31. *Id.* (citation omitted).

32. *Id.*

tion; hence, the purpose of a trademark is to "prevent confusion as to the origin of goods or services and to prevent fraud and misrepresentation as to their source."[33] Here, AS 44.09.015 does not provide the equivalent of copyright protection; rather, it provides protection analogous to trademark protection.

Finally, as the State points out, despite the broad sweep of federal copyright law, and despite a specific statute that places all federal government work in the public domain,[34] Congress has passed a statute protecting symbols similar to a state seal. Under 18 U.S.C. § 713(a) (2000), Congress has protected the great seal of United States, the seals of the President and the Vice President of the United States, the seal of the United States Senate, the seal of the United States House of Representatives, and the Seal of the United States Congress. Although Section 713(a) makes it a crime to use any of these seals "for the purpose of conveying . . . a false impression of sponsorship or approval by the Government of the United States," subsections (b), (c), (d), and (e) generally make it a crime merely to manufacture, reproduce, use, sell, or purchase any likeness of these seals (except the great seal of the United States) without permission from the appropriate agency. It seems evident that Congress, by protecting specific important federal seals that were left unprotected by copyright law (and by federal trademark law), did not intend to prohibit states from protecting seals that represent state sovereignty.

For all the above reasons, we conclude that federal copyright law does not preempt AS 44.09.015, which protects the state seal from unauthorized commercial use.

### Robart's requested protective order

Robart claims that he was entitled to a protective order that prevented the State's witnesses from claiming that they did not know that he was using the state seal after state employees saw it as part of his initial submission for the trade show. Robart based this request on his claim that under the theory of "imputed knowledge," the knowledge of one state employee must be imputed to all other state employees. After hearing argument, Judge Lohff denied Robart's motion. We find no error. Even assuming that Robart's theory of "imputed knowledge" among state agencies and employees was applicable in this case, Robart was convicted for using the state seal after the lieutenant governor expressly informed him that he was doing so illegally. It was not relevant what other state employees knew before Robart was warned. (Moreover, under Robart's "imputed knowledge" theory, when the lieutenant governor told him to stop using the seal, she acted on behalf of the governor.)

Additionally, Robart has not shown how he was prejudiced. No State witness testified that they were ignorant of Robart's use of the state seal. In his reply brief, Robart argues that he wanted the protective order to prevent the State from arguing that the governor could not or did not give him permission to use the state seal. But he did not present this reason to Judge Lohff, nor—for the reasons explained in the next section—was Robart entitled to a protective order that prevented the State from making this argument.

### Was the jury instructed on Robart's theory of defense?

Robart next claims that Judge Lohff should have given Robart's proposed jury instructions because these "instructions . . . described and defined Robart's theory of defense." At trial Robart characterized his defense as a mistake of fact, but he claimed that to establish this defense, he was entitled to have the jury instructed on general principles of corporate agency law. To that end, Robart sought instructions that defined "agent" and the scope of an agent's authority. He also wanted the jury instructed that an act or omission of state employees was the act or omission of the governor, and that any act or omission of any state employee, includ-

---

**33.** *Id.*

**34.** *See* 17 U.S.C. § 105.

ing the governor and the lieutenant governor, was the act or omission of the state.

■ Most importantly, however, Robart wanted the jury instructed that both the governor and the lieutenant governor could grant permission to use the state seal. Robart's desired defense, and his agency instructions, were based on the notion reflected in this last instruction: that because the governor is the head of the executive branch, he has the same authority as the lieutenant governor over the state seal. Judge Lohff properly rejected this instruction because it is not supported by the constitution or AS 44.09.015.

The Alaska Constitution provides that the lieutenant governor "shall perform such duties as may be prescribed by law and as may be delegated to him by the governor." [35] With regard to the state seal, the lieutenant governor has duties prescribed by law. In AS 44.19.022, the legislature expressly made the lieutenant governor the custodian of the state seal. Likewise, in AS 44.09.015, the legislature granted the lieutenant governor the authority to grant permission to use the state seal for a commercial use. These statutes show a clear legislative intent that the lieutenant governor has authority to permit use of the state seal for a commercial or advertising purpose. Although the governor can, by "appropriate court action or proceeding . . . enforce compliance with any constitutional or legislative mandate" [36] nothing in the constitution allows the governor to supplant the lieutenant governor with regard to that person's "duties . . . prescribed by law."

Hence, Judge Lohff properly rejected Robart's instructions because they misstated the law—that is, contrary to statute, they told the jury that the governor could grant permission to use the state seal.

Although Judge Lohff rejected Robart's assertion that the governor, as a matter of law, had the authority to grant permission to use the state seal, Judge Lohff allowed Robart to present a legitimate mistake of fact

defense. Judge Lohff instructed the jury that "[t]o prove that the defendant did not act under a reasonable mistake of fact, the state must prove" that "the defendant's mistaken belief that he had permission from the lieutenant governor to use a die or impression was not reasonable" and that "the defendant's reliance on a course of communication with the governor or the lieutenant governor in reaching his belief was not reasonable." This defense was based on evidence of the state's consistent failure to respond to Robart's requests for permission, on the encouragement to produce the medallions, and on the congratulatory letter from the governor. This defense properly allowed Robart to argue to the jury that the state, by its actions, "led him to believe that the State permitted his use of the seal."

We conclude that Judge Lohff did not err when, rejecting Robart's characterization of the mistake of fact defense, he denied Robart's proposed jury instructions.

Robart also claims that error occurred when, at the end of trial, Judge Lohff changed two instructions that he had given at the beginning of trial, when he gave the jury some preliminary instructions. Of these, one explained the elements of the offense, while another explained the elements of the defense. In each of these, however, the preliminary instructions omitted the statutory requirement that Robart have "written" permission from the lieutenant governor to use the state seal for a commercial purpose. Later, when discussing the final instructions, the State pointed out that these instructions, to accurately set out the elements of the statute, had to have the word "written" added. Judge Lohff agreed, but Robart objected.

■ On appeal, Robart argues that changing the preliminary instructions "vitiated" his defense. But Judge Lohff was required to instruct the jury on the essential elements of the offense.[37] Moreover, the defense of mistake of fact instruction did not require that

---

**35.** Alaska Const. art. III, § 7.

**36.** *Id.* art. III, § 16.

**37.** *See Sears v. State,* 713 P.2d 1218, 1219 (Alaska App.1986) ("[T]he trial court is under a duty to instruct the jury on the essential elements of the offense.").

the permission be in writing. The language of this instruction allowed Robart to argue, based on the encouragement he received from state agencies and on his correspondence with the governor and the lieutenant governor, that he had a reasonable "mistaken belief *that he had permission* from the lieutenant governor" to use the state seal.

In addition, Robart has not shown how his defense was prejudiced. The record shows that prior to trial he was clearly placed on notice by both the statute and the charging document that he had to have written permission to use the state seal. Before trial, Robart's position was that the governor's April letter was "specific written permission" to use the seal. As for his defense, Robart did not claim in his opening statement that he had written or unwritten permission to use the seal. Instead, he asserted that it had been a reasonable mistake of fact for him to rely on the pattern of non-response from the lieutenant governor, the letter from the governor, and the encouragement he received from other state agencies. In addition, Judge Lohff told Robart early in the trial that he could argue as part of his mistake of fact defense that he had reasonably considered that this letter constituted "written permission" to use the state seal. We conclude that Judge Lohff did not err when he corrected the erroneous preliminary instructions. Under the circumstances of this case, Robart's defense was not prejudiced.

### Robart's other requested instructions

Robart also claims that his theory of defense required the trial court to instruct the jury that the State could not claim that it was ignorant of the law and to apply the definition of "writing" that is included in the Uniform Commercial Code. Robart further claims that the jury should have been given an elaborate definition of what constitutes "acting unreasonably." He also claims that to ensure that the jury considered his defense, he was entitled to a special verdict form. Judge Lohff refused to give the first instruction, and modified the other two; he

also rejected Robart's proposed special verdict form. ·

■ Although the trial judge must instruct the jury on the essential elements of an offense or a defense, the trial judge has broad discretion to decide what other instructions to give the jury.[38] Here, we find no abuse of discretion.

Robart argues that the first of these instructions was important because he relied on the government to warn him that he did not have permission to use the seal. But even assuming that such an instruction would ever be warranted in a criminal case, Robart was warned by the lieutenant governor to stop using the state seal;[39] Robart was charged for using the state seal only after he ignored that warning.

■ Robart next argues that his other two requested instructions were necessary to allow him to present his defense. But "[a]s long as the instructions actually given by the trial court adequately set forth the applicable law, a more elaborate explanation of the defendant's theory of the case" is not required unless it "would substantially aid the jury in arriving at a just verdict."[40] The instructions as given by Judge Lohff adequately informed the jury as to what constitutes a "writing" under AS 44.09.015, and as to what "acting reasonably" means. Here, the jury was instructed that a writing "includes printing, typewriting or any other intentional reduction to tangible form." From this, Robart was allowed to argue that the governor's congratulatory letter, despite its lack of relevant language, was a "writing." Meanwhile, the jury was instructed that "acting reasonably" meant that "[i]n deciding whether a party acted reasonably or unreasonably, you may consider what a reasonably prudent person would do under similar circumstances" and that "[a]cting reasonably may consist of doing something that a reasonably prudent person would do, or it may consist in not doing something that a reasonably prudent person would not do." Again, this was suffi-

---

38. *Stoneking v. State,* 800 P.2d 949, 950 (Alaska App.1990).

39. *Robart,* 988 P.2d at 1114.

40. *Lee v. State,* 760 P.2d 1039, 1041 (Alaska App.1988).

cient to allow Robart to argue that he had acted reasonably, and that the State had acted unreasonably.

Accordingly, we conclude that no error occurred by the rejection or modification of these three instructions.

Judge Lohff also rejected the special verdict form. Robart argues that the special verdict form was required to ensure that the jury properly considered the elements of his mistake of fact defense. He made a similar argument below, but Judge Lohff rejected this argument and found that the jury could follow the instructions setting out Robart's defense. We conclude that Judge Lohff did not abuse his discretion by using a general verdict form.

*Conclusion*

Robart's conviction is AFFIRMED.